## IN RE HOUSE.

### WILLIAMSON v. BOARD OF COUNTY COMMISSIONERS OF ARAPAHOE COUNTY.

1. LEGISLATIVE POWER.

Legislative enactments, the object of which is to provide for the comfort and well-being of such persons as by reason of infancy, defective understanding, or other misfortune or infirmity are unable to take care of themselves, are not to be interfered with unless some constitutional limitation plainly and unequivocally requires it.

2. CONSTITUTIONAL LAW—FORBIDDEN APPROPRIATIONS.

The constitutional provision that no appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state (sec. 34, art. 5, Const.), has reference to state money only, and does not inhibit the legislature from conferring upon counties the power to use county funds in the treatment and cure of their indigent inebriates as provided by the act of 1895.

*Error to the County Court of Arapahoe County.*

Mr. H. T. SALE, Messrs. MULLAHEY & RICE and Mr. C. M. RIGLEY, for plaintiff in error.

Messrs. GOUDY & TWITCHELL, for Arapahoe County.

MR JUSTICE GODDARD delivered the opinion of the court.

An application was made to the county court of Arapahoe county, asking for an order to send William T. House to the Keeley Institute, at Denver, Colorado, at the expense of the county, for treatment and cure, as a drunkard, under the provisions of chapter 74, Sess. Laws 1895. The proceeding is in conformity with the requirements of the act, and the facts disclosed in the record clearly bring the case within its provisions. The court below denied the order solely upon the ground that the statute was unconstitutional, and this is the only question presented for our determination.

The act, by its first section, provides: "Any friend of an habitual drunkard, * * * or any officer of any charitable organization, may file a petition in the county court in the county where such drunkard may reside, setting forth the sex, financial condition, the age, as near as may be, and the nature and extent of the disease of such drunkard in reference to the use of alcoholic, narcotic or other stimulants, and stating the belief of petitioner or affiant that such disease has passed beyond the control of said drunkard, and asking for an order to send such drunkard to an institution for the treatment of such disease at the expense of the county. The petition or affidavit may also contain such other facts as the applicant may deem proper in order to inform the court of the condition of such drunkard. Such petition shall be verified by the petitioner, and the petition or affidavit shall be approved and signed by ten (10) freeholders of the county."

Section 2 provides for the hearing of such petition upon notice to the county attorney, and to the drunkard, unless he voluntarily appears, and that, if it appear to the county judge that the matters set forth in the petition are true, and

that the said drunkard has been a *bona fide* resident of the county at least six months preceding, and is financially unable to pay for the treatment of said disease, and has consented and agreed thereto, the county judge shall immediately make an order directing that he be sent to an institution for the cure of drunkenness within the state, at the expense of the county.

Section 4 provides for the verification and presentation of its claim for the treatment of such drunkard by the manager or person in charge of the institution furnishing such treatment.

Section 5 provides that, upon presentation of such claim "to the board of county commissioners of the county of the drunkard's residence, they shall allow the same, as in case of other claims against the county, and make an order on the county treasurer for the payment of the same; Provided, all such claims shall be reasonable and not in excess of current rates; that no such claim shall be allowed for a greater amount than twenty-five (25) dollars per week for the treatment, including medical attendance and medicines of such drunkard, nor for a greater amount than seven (7) dollars per week for his board, lodging and keeping."

Section 6 defines a drunkard as "any person who has acquired the desire of using alcoholic or malt drinks, morphine, opium, cocaine or other narcotic substance used for the purpose of producing intoxication, to such a degree as to deprive him or her of reasonable self-control."

The object sought to be attained by this act is to provide for a class of its poor who have become helpless and unable to care for themselves, and is clearly within the govermental functions of the state, and a proper exercise of legislative power, unless inhibited by some constitutional limitation. The duty of the state to make provision for the care and maintenance of those who, through misfortune or disease, are unable to take care of themselves, has been too long recognized and established by the legislation of this country to admit of question. The indigent poor and infirm, the

insane, orphaned and dependent children, and all destitute and helpless persons within its sovereignty, have ever been recognized as legitimate recipients of its bounty, and their welfare as a proper subject of its solicitude and care. The proper exercise of this humane duty ought not to be interfered with unless some constitutional limitation plainly and unequivocally requires it. As was said by Mr. Justice Mulkey, in the case of *McLean Co. v. Humphreys*, 104 Ill. 378: "It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriæ*, to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise."

It is contended by the county attorney that this act offends against section 34, art. 5, of our constitution, which declares: "No appropriation shall be made for charitable, industrial, educational or benevolent purposes, to any person, corporation, or community not under the absolute control of the state, nor to any denominational or sectarian institution or association." And also against section 35, which provides: "The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes, or perform any municipal function whatever." The contention is that section 34 prohibits, not only the appropriation of state money for the purposes mentioned, but as well money belonging to the county; the argument being that a county is a mere political subdivision of the state, created for the purpose of keeping the machinery of government in motion, for the convenience of the general public,— in other words, that the county is a mere agency and a part

of the state government. Hence, if the legislature is prohibited from making such appropriations as specified in section 34, it cannot authorize or require counties—creatures of its own making—to pay money for the inhibited purposes. We think this claim is unsound. The appropriation contemplated in section 34 is of state money only. Its language does not, in terms or by intendment, limit the power of the legislature in disposing of county money. That article 5, in defining and limiting the powers of the legislature in the matter of appropriations, had in contemplation the disbursement of state funds only, and their disposition by the state in its corporate capacity, is apparent from an examination of other provisions therein contained, which relate to the subject of revenue. They treat strictly of state matters, and the payment of money out of the state treasury. The manner prescribed by section 32 in which appropriations must be made in itself precludes the idea that the appropriation of other than state money was contemplated by the framers of the constitution. We cannot doubt that, had they intended, by section 34, to inhibit the application of county and municipal, as well as state funds, to the specified purposes, they would have said so in express terms, as they did in cognate sections in the same instrument,—notably section 7, art. 9, which inhibits not only the general assembly, but counties, cities, towns, townships, schools, and other public corporations expressly from making any appropriation from any public fund in aid of any church or sectarian society, etc.; and section 1, art. 9, that expressly forbids any county or city, as well as the state, from lending or pledging their credit to any person, company, or corporation, etc. Although, in section 3 of this article, they limit the state indebtedness, by section 6 they also limit the county indebtedness. If, in these instances, it was deemed necessary, in order to extend the inhibition to those municipalities, to expressly name them, it is reasonable to infer that, if it had been the intention to include within the inhibition of section 34 counties and other public corporations, equally comprehensive language would have been used.

In the case of *Clark v. City of Janesville*, 10 Wis. 136, bonds issued by the city of Janesville in aid of a railroad company were attacked, on the ground that the constitution prohibited the state from giving aid to such corporation, and from contracting any debt for works of internal improvement, etc. And it was argued there, as here, that such inhibition applied to cities, towns, and counties also, they being parts of the state. Speaking upon the question involved here, Paine, J., said: "It is said that cities, counties, and towns are parts of the state, constituting its political divisions, and that, as such, they come within the spirit and intent of these prohibitions; that for the state to authorize them to loan their credit in carrying on internal improvements is to do indirectly what it cannot do directly; and that to sustain such a law is to say that the state may grant to a part of itself the power to do what the whole cannot, and that power may be derived from a source where it does not exist. It is manifest that the whole question is whether for a city, town or county to loan its credit is a loan of the credit of the state, —whether, if either became a party in carrying on works of internal improvement, that makes the state a party to such work. Clearly, they are not within the letter of the constitution. A city is not the state. Neither is a town or county. The question then is whether they are within the spirit of the provision, and it seems to me beyond doubt that they are not. On the contrary, these two sections, like nearly all in article 13, relate exclusively to the state as a whole, and were not designed to regulate or limit the powers of counties, cities, or towns."

And in the case of *Pattison v. Supervisors*, 13 Cal. 175, the court, speaking upon a like question, said: "The argument, more fully developed by the learned counsel, seems to be this: The state is forbidden, by the eighth article of the constitution, to create debts over three hundred thousand dollars, or to loan its credit, etc.; the counties are component parts of the state; the state cannot authorize the creation of this debt by its separate subdivisions any more than by itself

as a whole. If this argument were sound, it would seem to follow that all indebtedness of every sort, incurred by all the counties of the state—the state having exceeded its privileged limit—is void. But the radical error of the argument is, this provision only applies to the state as a corporation—as a political sovereign, represented by her lawmaking power. * * * The intent of this clause of the constitution is plain enough; it was designed as a check on legislation, and such legislation as might create a charge upon the property of the entire state. But it is not only unwarranted by the words of the constitution to suppose that counties were included in this inhibition, but it might well have been foreseen that the provision would prove extremely embarrassing, if it did not entirely stop the operations of those local governments."

Section 10, art. 8, of the constitution of New York, as amended in 1874, provides that "neither the credit nor the money of the state shall be given or loaned to, or in aid of, any association, corporation or private undertaking. This section shall not, however, prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents as it may deem proper. Nor shall it apply to any fund or property now held, or which may hereafter be held, by the state for educational purposes."

By an act of the legislature, passed in 1871, the supervisors of the county of New York were authorized to levy and collect, by a tax upon the taxable property of the city and county of New York, the sum of $5,000, and to pay the same to the "Shepherd's Fold," a private corporation organized for the purpose of caring for orphaned and friendless children.

In the case of *Shepherd's Fold v. Mayor, etc.,* 96 N. Y. 137, the validity of this act was assailed as being in contravention of the foregoing provision of the constitution, upon the ground that the money authorized to be raised was money of the state, and its payment inhibited thereby. Upon this contention the court say: "The first question which arises

is whether the money authorized to be raised by the supervisors to be paid over to this institution was money of the state, within the meaning of section 10 of article 8 of the constitution. It seems to us that the section had reference to money raised by general taxation throughout the state, or revenues of the state, or moneys otherwise belonging in the state treasury, or payable out of it, and not to money raised by ordinary local taxation for local purposes, and to be disbursed by local authorities." To the same effect are *White v. Boody*, 74 Hun, 39, 26 N. Y. Supp. 294; *White v. Inebriate Home*, 141 N. Y. 123; *People v. Flagg*, 46 N. Y. 401; *State v. Seibert*, 123 Mo. 424.

We think it would be doing violence to the express letter and manifest intendment of section 34 to hold that it inhibits the legislature from conferring upon counties the power to use county funds in the treatment and cure of their indigent inebriates in the manner provided in the act in question, and more clearly untenable is the claim that the act contravenes the provisions of section 35. The design and purpose of this section is to prohibit the delegation to private corporations of the exercise of powers strictly governmental, and we are unable to perceive wherein the act delegates any such power to the institute. The service it renders in the treatment and cure of inebriates is in no sense the performance of any of the inhibited municipal functions. While the act may in some respects be defective, and subject to some of the criticisms urged against it, it is not, in our opinion, obnoxious to any of the constitutional objections urged, and must be upheld as a legitimate exercise of legislative power.

We have carefully considered all the other constitutional objections so ably and exhaustively urged by counsel, but deem it unnecessary to specifically comment upon them, since our conclusion is that they in no way affect the validity of the statute. The judgment of the county court is accordingly reversed, and the cause remanded.

*Reversed.*