MINNESOTA SUGAR COMPANY v. SAMUEL G. IVERSON.[1]

December 4, 1903.

Nos. 13,565—(7).

**State Auditor.**

The State Auditor refused to allow and issue warrants for the sugar bounty provided for in Laws 1895, c. 205, as amended by Laws 1899, c. 307, for the year 1900, upon the ground that both of the above-mentioned acts are in direct violation of sections 5, 10, article 9, of the Constitution. *Held* that, when the Auditor refused to issue the warrants for the reasons before stated, he acted in a quasi judicial capacity, and in a manner affecting the rights or property of a citizen analogous to the manner in which they are affected by proceedings or decisions of the courts, and that certiorari will lie in such a case to review his acts, and to determine the rights of a petitioner to the bounty before mentioned.

**Sugar Bounty Unconstitutional.**

Laws 1895, c. 205, as amended by Laws 1899, c. 307, providing for the payment of certain bounties to manufacturers of sugar from beets grown in this state, is unconstitutional, because in violation of the provisions of sections 5, 10, article 9, of the fundamental law.

**Unconstitutional Statute.**

An unconstitutional statute is simply a statute in form, is not a law, and under every circumstance or condition lacks the force of law. It is of no more saving effect to justify legislative action taken under it than as though it had never been enacted. No moral obligation on the part of the state can be predicated upon an unconstitutional statute.

Writ of certiorari issued from the supreme court upon petition of Minnesota Sugar Company, to review the act of respondent, as State Auditor, in refusing to issue a warrant upon the state treasurer for $19,925.36, to which amount petitioner claimed to be entitled as bounty under the provisions of Laws 1895, c. 205, as amended by Laws 1899, c. 307. Writ discharged.

*Douglas A. Fiske, Ell Torrance,* and *Childs, Edgerton & Wickwire,* for petitioner.

Whether the act of an official is judicial or ministerial, is not determined by the character of the agency but by the nature of the act.

[1] Reported in 97 N. W. 454.

Where, in the exercise of a power, an officer is vested with discretion, his act is regarded as quasi judicial. Throop, Pub. Off. § 533; U. S. v. Arredondo, 6 Pet. 691; U. S. v. California & Ore. Land Co., 148 U. S. 31; Commissioner v. Smith, 5 Tex. 471, 479; Kendall v. U. S., 12 Pet. 524; Brashear v. Mason, 6 How. 92, 100; State v. Sullivan, 50 Fed. 600; Grider v. Tally, 77 Ala. 422, 424; State v. Dunn, 86 Minn. 301. It matters not that the court cannot by certiorari cause the board to act and do its duty. It can review the erroneous determination of the board and then if the board should refuse to allow the claim, the relator can take such further remedy by mandamus, or otherwise, as the law gives. People v. Board, 51 N. Y. 442; State v. Dowling, 50 Mo. 134; Levy v. Lychinski, 8 Ark. 113, 116; Devlin v. Platt, 11 Abb. Pr. 398, 400.

The question whether, to what extent and by what means, the industrial resources of the state should be encouraged is essentially legislative in its nature. Hazen v. Essex, 12 Cush. 475; Newcomb v. Smith, 2 Pinney, 131; Booth v. Town, 32 Conn. 118, 128; Todd v. Austin, 34 Conn. 78; Stockton v. Common Council, 41 Cal. 147. From the nature of the subject, the legislature is vested with great latitude in dealing with it, and its determination will not be disturbed unless wholly irreconcilable, from every possible view, with the Constitution. Attorney General v. City, 37 Wis. 400, 438; Dayton v. Seawell, 11 Nev. 394; Talbot v. Hudson, 16 Gray, 417; Town of Guilford v. Board, 13 N. Y. 143; Citizens' Sav. & L. Assn. v. Topeka, 87 U. S. 655; State v. Cornell, 50 Neb. 526; State v. Board of Commrs. of Polk Co., 87 Minn. 325. The bounty was intended for securing one of the factors—a manufactory—which was requisite to the accomplishment of the public purpose. The real purpose was not aid to the manufacturer. Nor was the distribution of the beet seed to aid any particular farmer.

The development of the industrial resources of a state is a proper subject of legislation, and appropriations of public moneys may be made therefor. Lowell v. City, 111 Mass. 454; Hand v. Parker, 59 Ga. 419; Dayton v. Seawell, 11 Nev. 394; Talbot v. Hudson, 16 Gray, 417; Commercial Nat. Bank v. City of Iola, 2 Dill. 353; City of Minneapolis v. Janney, 86 Minn. 111; Town v. Park, 50 Vt. 178; State v. Cornell, supra.

The bounty was not a gift but rested upon an adequate consideration. Ingram v. Colgan, 106 Cal. 113. The petitioner having fully performed, a vested right in the bounty was acquired. Calder v. Henderson, 54 Fed. 802; Smith v. Board, 85 Mich. 407; Taylor v. Ypsilanti, 105 U. S. 60.

Conceding for the purpose of the argument that the original bounty act was invalid, yet performance by the petitioner under the previous legislation was sufficient to create a moral consideration for the enactment of Laws 1899, c. 307. U. S. v. Realty Co., 163 U. S. 427; New Orleans v. Clark, 95 U. S. 644; Read v. Plattsmouth, 107 U. S. 568 (citing New Orleans v. Clark); Guthrie Nat. Bank v. Guthrie, 173 U. S. 528; Bailey v. Philadelphia, 167 Pa. St. 569, 573; Goulding v. Davidson, 26 N. Y. 604, 612; State v. Foley, 30 Minn. 350, 357; State v. Bruce, 50 Minn. 491; Friend v. Gilbert, 108 Mass. 408.

The Constitution of Minnesota requires the application of a liberal rule in the construction of the statute in question. City of Minneapolis v. Janney, 86 Minn. 111; Lommen v. Minneapolis Gaslight Co., 65 Minn. 196, 207.

*W. B. Douglas,* Attorney General, for respondent.

Both chapter 205 of the Laws of 1895 and chapter 307 of the Laws of 1899, provide for the expenditure of public funds for other than a public purpose, and are therefore not only invalid, independent of constitutional restrictions, but are in violation of the Constitution of the state. Const. art. 9, §§ 5, 10; Davidson v. Co. Commrs. of Ramsey Co., 18 Minn. 432 (482); Wm. Deering & Co. v. Peterson, 75 Minn. 118.

The legislature is without authority to appropriate money or provide for the imposition of a tax, except for a public purpose. City of Fergus Falls v. Fergus Falls Hotel Co., 80 Minn. 165; Lowell v. City, 111 Mass. 454; State v. Osawkee, 14 Kan. 418; Michigan v. Auditor General, 124 Mich. 674.

A manufacturing company is not a public enterprise within the meaning of the above rule and a donation or bounty thereto is not a grant of money other than for a private purpose. Coates v. Campbell, 37 Minn. 498; Loan Association v. Topeka, 20 Wall. 655; Parkersburg v. Brown, 106 U. S. 487; Cole v. La Grange, 113 U. S. 1, 6.

COLLINS, J.

At the last term of this court the petitioner herein applied for a writ of certiorari directed to the State Auditor, and requiring him to transmit certified copies of the records of his office, and all of the reports theretofore made to him, and all other papers relating to the claim of the petitioner for a bounty upon sugar manufactured by it during the year 1900, which bounty, it was asserted, was due from the state under the provisions of Laws 1895, p. 490 (c. 205) as amended by Laws 1899, p. 389 (c. 307). Upon the return to the order to show cause, and a stipulation, we directed that the writ issue as prayed for, but deferred stating our reasons for so determining until the question arising upon the return should be presented for decision. The return having been made, the cause was set down for argument upon the merits, and has been duly presented and submitted by counsel for the respective parties.

We shall first express our views on the right of the petitioner to the writ. In State v. Clough, 64 Minn. 378, 67 N. W. 202, it was stated that to render the proceedings of special tribunals, commissioners, or ministerial officers judicial in their nature, they must affect the rights and property of a citizen in a manner analogous to that in which such rights are affected by the proceedings of courts acting judicially. Further discussion in that opinion was merely elaborative of the above concise proposition. The perplexity in determining whether or not certiorari will lie in any given case arises out of the difficulty in distinguishing between legislative, executive, or ministerial acts, and those of a judicial nature, in which an officer, commissioner, or a special tribunal is called upon to act in a judicial or quasi judicial capacity. This is the chief distinguishing test, as is conceded by the Attorney General. If the determination of the tribunal or the officer called upon to act affects the rights or property of a citizen analogous to the manner in which they are affected by proceedings or decisions of courts acting judicially, the proceedings in question are of a judicial nature, and the writ will lie. If they do not so affect rights or property, the determination in question must be considered as ministerial, legislative, or administrative, as the case may be, and so treated by the courts. The character of the office or tribunal does not determine the question, but, rather, the nature of the act performed.

Under the 1899 statute the State Auditor is made the officer who

91 M.—3

has to pass upon and determine the validity of all claims for bounty made by any party under the act. If the Auditor, by acting in conformity with the statute, has the power of adjudication upon the rights of persons and property, his acts must be quasi judicial, at least. He is the special tribunal or officer called upon to determine what the law is, and what the legal rights of the parties are, and he acts judicially when passing upon the constitutionality of the law and disposing of such rights. In the case at bar the State Auditor exercised no ministerial duties whatever when he declined and refused to allow the claim upon the ground that the law upon which the petitioner was obliged to rely was unconstitutional. He disposed of the petitioner's property rights in precisely the manner in which they might be affected or swept away by proceedings in the courts. He ascertained no facts, nor was he compelled so to do, according to the stipulation, for they were agreed upon. He did not have to construe the law, because its terms were plain and beyond controversy. The facts being undisputed, the Auditor declared that the law in question was obnoxious to the constitutional provisions, and for that reason alone he refused to comply with it.

In State v. Dunn, 86 Minn. 301, 304, 90 N. W. 772, it was said that "the exercise of judicial functions may involve the performance of legislative or administrative duties, and the performance of administrative or ministerial duties may, in a measure, involve the exercise of judicial functions. It may be said generally that the exercise of judicial functions is to determine what the law is, and what the legal rights of parties are, with respect to a matter in controversy; and whenever an officer is clothed with that authority, and undertakes to determine those questions, he acts judicially." It is obvious that in the present case the act of the Auditor was judicial. It matters not that the court cannot by a writ of certiorari cause the Auditor to act in conformity with the bounty act. We can merely review his determination at this time, and, if found erroneous, another and further remedy must be discovered by the petitioner.

Having stated the sole issue made by the return, we pass to the merits of the case, and find involved the constitutionality of Laws 1899, p. 389 (c. 307), the requirements of which have been complied with in all matters of detail by the petitioner. This statute was an amendment to Laws 1895, p. 490 (c. 205), which appears to have been enacted without

any reference whatsoever to the cultivation of the sugar beet in Minnesota. It contained no provision that the sugar for which a state bounty was to be paid should be manufactured from beets grown in Minnesota, nor did it provide, as does the act of 1899—although this fact is not material in the present controversy—that the manufacturer should pay a certain minimum sum per ton for all beets consumed. Other regulations found in the last-mentioned act, and upon which counsel for petitioner have placed great stress, are not to be found in that of 1895.

The Attorney General, representing the state, insists that at least two sections (sections 5 and 10 of article 9) of the Constitution are violated by the provisions of either and both of these acts. These sections of the fundamental law are limitations upon the state, solely, not upon minor subdivisions thereof; and three propositions are submitted in behalf of the state, as follows: First, that under section 5 the state (with certain exceptions) is prohibited from contracting any debt or being a party in carrying out any work of internal improvement; second, that under section 10 the state is prohibited from giving or loaning its credit or aid to any individual, association, or corporation; third, that irrespective and independent of these provisions the legislature is powerless to provide for or authorize the expenditure of public funds of the state except for a public purpose. Naturally these propositions are very closely associated. And the Attorney General also contends that the whole question involved in this case has already been determined by this court in each of the following cases: State v. Foley, 30 Minn. 350, 15 N. W. 375; Coates v. Campbell, 37 Minn. 498, 35 N. W. 366; Rippe v. Becker, 56 Minn. 100, 57 N. W. 331; Wm. Deering & Co. v. Peterson, 75 Minn. 118, 77 N. W. 568. It is argued that it is well settled by these cases that the legislature is powerless to appropriate money for the purpose designated in these acts, because this bounty is simply a gratuity from the state for the encouragement of a private enterprise and the aggrandizement of private parties. Let us turn to these cases, and examine them with reference to the assertion of counsel for the state that, if they are to be followed, this case is easily disposed of adversely to the petitioner's claim:

In State v. Foley, supra, it was said, when referring to the legislative power of taxation, that it "does not extend to the exacting of contributions from the people for a merely private purpose, unconnected with

any duty, moral or legal, on the part of the state or of the political sub-division upon which the burden is imposed. · Such a proceeding would not be taxation at all. Taxation comprehends only the imposition of charges for public purposes."

Again, in Coates v. Campbell, supra, a case in which the legality of certain bonds issued by a village in aid of the improvement of a private water power—the village to have part of the power for the perpetual use of its fire department—was at issue, the court used this language: "As it is entirely manifest that the general and chief purpose of the act is to improve the water power, and without which purpose the act would not have been passed, the question necessarily arises, what is to be the character of its use when improved? Is it to be public or private? To the consideration of this question it is important that the water power is not the property of the village corporation or the public, and that there is no public control over the management of the property or the expenditure of the fund; that the village corporation has no authority to own or manage water powers. The water power must belong to some private person or corporation, and the public has no more right or interest in it, or right in its use, than in any other water power owned by a private person or corporation. * * * The public has no interest in its improvement, and derives no benefit from it, beyond the incidental benefit arising from any person improving his own property. That is not an interest that will justify taxation. Certainly no one would claim that funds may be raised by taxation to aid a private person in constructing a private building on his own lot, although incidentally it will enhance the value of all the lots in the city or village. That this water power is private in its ownership and use puts it beyond the legitimate objects for which taxes may be imposed."

In Rippe v. Becker, supra, the question presented was the right of the state to appropriate money then in its treasury, and to add to this amount by imposing a tax, for the purpose of constructing a mammoth elevator for the use of the grain raisers of the state, and the constitution-al provisions before referred to were directly under consideration. It was contended that these provisions had reference solely to highways . for travel and commerce, and that the legislature was at liberty to ap-propriate money for the upbuilding of any industry in the state which it might deem to be of public benefit, and that the expenditure of public

funds in this way could be properly considered as an exercise of the police power through a regulation of the grain business. The court would not so hold, and in forceful and vigorous language declared that the building of an elevator to be used and managed by the state would be a work of internal improvement, forbidden by section 5. It was said that to so construe this section would permit not only the building of grain elevators by the state, but would also authorize its "engaging in schemes of drainage, irrigation, developing water powers, building public gristmills, public creameries and cheese factories, establishing stock yards and packing houses, and other like enterprises, almost without limit." It should be here noticed that under this law the state was to construct, equip, and operate the elevator. It was to own and manage it as a public enterprise. It was not to be conducted by a private individual for a private purpose, as would be the sugar manufactories subsidized by the acts in question.

In Wm. Deering & Co. v. Peterson, 75 Minn. 118, 77 N. W. 568, the court had under consideration the power of the legislature to appropriate money from its treasury for the use of destitute farmers whose crops had been destroyed by hail. The court held such legislation invalid, because obnoxious to section 10, reiterating what had been said in the Coates case—that municipal bonds cannot be issued to aid an enterprise partly public and partly private, that taxation cannot be imposed for private purposes, and that a state cannot appropriate money in its treasury for a private purpose, and then replace it by taxation, for by so doing it would do indirectly what it could not do directly.

That the legislature is without authority to appropriate money or to provide for the imposition of a tax, except for a public purpose, has again and again been held by this court; and it would seem to be self-evident that if it cannot provide for the imposition of a tax, except for a public purpose, it cannot appropriate money for such purpose, the direct result being the imposition of a tax to replenish the treasury. The property of our citizens cannot be made subject at any time to the absolute disposition and unlimited control of any legislative body. The power of such a body is curtailed and well defined, and the limitations on such power must grow out of the essential need of all free governments. As was said in Loan Association v. Topeka, 20 Wall. 655, when the court was considering what might be a public purpose for

which taxation could be upheld: "To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals, to aid private enterprises and build up private fortunes, * * * is done under the forms of law, and is called 'taxation.'" "But," said the court, "in the case before us, in which the towns are authorized to contribute aid by way of taxation to any class of manufacturers, there is no difficulty in holding that this is not such a public purpose as we have been considering. If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or labor."

That a manufacturing company is not a public enterprise, within the meaning of any well-settled rule, and that a gratuity or bounty thereto is not a grant of money other than for a private purpose, is universally held in the courts of the United States. It is upon this principle that the cases we have cited from our own reports are based. The raising of sugar beets for manufacture in this state is just as much of a private business enterprise as is the manufacture of sugar therefrom, or the carrying on of any other kind of a manufacturing business. All are private enterprises, and the state is prohibited from engaging in them. It is also universally held that, to sanction a grant of public funds, the public purpose involved must be direct. In addition to the authorities cited from our own court in which the subject of legislative appropriations has been generally discussed, and wherein it has been asserted that benefits to be derived by the public must be direct, we quote the following language from an opinion rendered in the court of last resort in a sister state: "If we turn to the cases where taxation has been sustained as in pursuance of this power, we shall find in every one of them that there was some direct advantage accruing to the public from the outlay, either by its being the owner or part owner of the property or thing to be created or obtained with the money, or the party immediately interested in and benefited by the work to be performed, the same being matters of public concern, or because the proceeds of the tax were to be expended in defraying the legitimate expenses of government, and in promoting the peace, good order, and welfare of society." Curtis v. Whipple, 24 Wis. 350, 354.

But the precise question presented by the bounty acts has been deter-

mined in Michigan, where a statute identical with the one now before us was declared repugnant to the state Constitution in the year 1900. Michigan v. Auditor General, 124 Mich. 674, 680, 83 N. W. 625. The discussion is so well conducted in that case that we quote at length: "The discrimination by the state between different classes of occupations, and the favoring of one at the expense of the rest, whether that one be farming or banking, merchandising or milling, printing or railroading, is not legitimate legislation, and is an invasion of that equality of right and privilege which is a maxim in state government. When the door is once opened to it, there is no line at which we can stop, and say with confidence that thus far we may go with safety and propriety, but no further. Every honest employment is honorable. It is beneficial to the public. It deserves encouragement. The more successful we can make it, the more does it generally subserve the public good. But it is not the business of the state to make discriminations in favor of one class against another, or in favor of one employment against another. The state can have no favorites. Its business is to protect the industry of all, and to give all the benefit of equal laws. It cannot compel an unwilling minority to submit to taxation in order that it may keep upon its feet any business that cannot stand alone. Moreover, it is not a weak interest only that can give plausible reasons for public aid. When the state once enters upon the business of subsidies, we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the weaker will be taxed to enhance the profits of the stronger." The sugar bounty act of Congress was before the Court of Appeals of the District of Columbia, and held unconstitutional, in U. S. v. Carlisle, 5 App. D. C. 138. We need not quote from that case, but the argument there found is unanswerable and is directly in point.

Finally, upon this point, we concede the difficulty of formulating a comprehensive definition of what may constitute a public purpose or use, but certain it is that the purpose or use to which the legislature attempted to appropriate money in the sugar bounty act falls far outside of any rule we have been able to discover. It was simply an attempt to aid a private business enterprise, over which the state had no control, and could exercise no more supervision than it could over one of the hundreds of merchant flouring mills scattered over the state. Both and

each of the bounty acts violate the constitutional provisions before mentioned.

The claim is made that the state is under a moral obligation to pay this bounty, and reliance is placed upon U. S. v. Realty Co., 163 U. S. 427, 16 Sup. Ct. 1120. There the court declined to pass upon the question whether the original legislation—the congressional bounty act—was constitutional, but assumed, for the purposes of the decision, that it was not. That case has been very severely criticised, and we are unable to find any other in which it has been held that the unconstitutional act of a legislative body is any justification in law for any action or nonaction. It has again and again been held that an unconstitutional statute is simply a statute in form, is not a law, and under every circumstance or condition lacks the force of law, and, further, that it is of no more saving effect to justify action taken under it than as though it had never been enacted. A moral obligation upon the part of the state must have something more substantial than legislation obnoxious to the fundamental law to rest upon—something more for a foundation or starting point than a statute which is itself immoral. A moral obligation can never be deemed to rest upon the people of the state to discharge a contract made by the legislature in direct violation of the Constitution, and no such obligation can be predicated upon the act in question. A well-considered case upon this subject is Adsit v. Osmun, 84 Mich. 420, 48 N. W. 31.

With this proposition so well established, it seems almost superfluous for us to call attention to the fact that this manufacturing plant was built under the original act, which, as before stated, was of no more value to the people of Minnesota than it was to those of any other state within shipping distance, and, further, that, instead of recognizing any obligation under this legislation, there has always been a repudiation of its pretended obligation.

Writ discharged.