[No. 15620.  *En Banc.*  March 30, 1920.]

THE STATE OF WASHINGTON, *on the Relation of the State Reclamation Board et al., Plaintiff,* v. C. W. CLAUSEN, *as State Auditor, Respondent.*[1]

TAXATION (5)—RESTRICTIONS—PUBLIC PURPOSE. No funds can be raised by taxation except for a public purpose.

CONSTITUTIONAL LAW (3)—RULE OF CONSTRUCTION. A statute will not be declared unconstitutional unless it clearly so appears, and this rule is peculiarly applicable to an act authorizing the levy of a tax for a public purpose.

TAXATION (5) — RESTRICTIONS — PUBLIC PURPOSE—LAND DEVELOPMENT ACT. The land settlement act, Laws 1919, p. 583, authorizing the raising of funds by taxation for the purchase, improvement and settlement of undeveloped agricultural lands, to be disposed of by the state to private individuals, is not unconstitutional as levying a tax for other than a public purpose, the legislature, by the act, having decided that it was a public purpose.

CONSTITUTIONAL LAW (103, 104) — DISCRIMINATION — LAND DEVELOPMENT ACT. The land settlement act, Laws 1919, p. 583, for the development of agricultural lands to be purchased, improved and sold by the state, is not unconstitutional in that it discriminates in favor of agricultural lands.

SAME (100, 102) — PRIVILEGES AND IMMUNITIES — PREFERENCE RIGHTS TO SOLDIERS. The land settlement act, Laws 1919, p. 583, for the development of agricultural lands, giving soldiers a preference right of purchase, does not violate the equal privileges and immunity guaranty of the constitution.

[1]Reported in 188 Pac. 538.

SAME (129)—DUE PROCESS—TAXATION—PUBLIC PURPOSE. Since the land settlement act, Laws 1919, p. 583, does not provide for a tax for other than a public purpose, it does not violate the due process clause of the fourteenth amendment to the Federal constitution.

MACKINTOSH and MOUNT, JJ., dissent.

Application filed in the supreme court November 4, 1919, for a writ of mandamus to compel the state auditor to issue a warrant to relator in payment for land purchased by the state reclamation board under the land settlement act.    Granted.

*The Attorney General* and *Glenn J. Fairbrook, Assistant,* for relators.

*Frank C. Owings,* for respondent.

PARKER, J.—This is an original mandamus proceeding in this court, wherein the relators seek a writ of mandate to compel the state auditor to issue a warrant against the state reclamation revolving fund to the relator, George J. Hurley, in payment for 160 acres of land purchased from him by the state reclamation board under the land settlement act, Laws of 1919, ch. 188, page 583.    The auditor has refused to issue the warrant as demanded of him, basing his refusal upon the sole ground that the land settlement act is unconstitutional.

To the end that we have clearly before us the full purpose and scope of the land settlement act, we deem it desirable at the outset to here quote the larger portion of it, as follows:

"An act relating to the upbuilding of the agricultural resources of the state, establishing a state policy for land settlement, defining the powers and duties of the state reclamation board in reference thereto, and making appropriations therefor.

"Be it Enacted by the Legislature of the State of Washington:

"Section 1. This act shall be known and cited as the 'Land Settlement Act.'

"Sec. 2. The State of Washington in the exercise of its sovereign and police powers declares that the settlement of such portions of the undeveloped lands in this state as may be determined to be suitable and economically available therefor is a state purpose and is necessary to the public health, safety and welfare of its people. In the exercise of such power the state, acting for itself and in co-operation with the United States, hereby establishes a definite land policy providing means whereby soldiers, sailors, marines, and others who have served with the armed forces of the United States in the war against Germany and her allies, or other wars of the United States, hereinafter generally referred to as 'soldiers,' and also industrial workers and other American citizens desiring a rural life, may settle upon and become owners of small improved farms and farm laborer's allotments.

"Sec. 3. That the state reclamation board created by the 16th legislature, hereinafter called the 'board,' shall have power to co-operate with the federal government in the settlement of any undeveloped lands in this state. . . .

"Sec. 4. The board shall have power:

"To investigate and select for settlement suitable areas of undeveloped lands in this state available for settlement;

"To purchase and acquire on behalf of the state such privately owned lands as in its judgment are available for settlement;

"To subdivide any lands owned by the state and found available for settlement, including lands purchased or acquired for that purpose, into tracts suitable for farms and farm laborer's allotments;

"To make on any such farms and farm laborer's allotments such improvements as may be necessary to render the same habitable and productive;

"To accept from private owners deeds or other in-

struments of trust relating to land and to subdivide, improve, and sell such lands;

"To lease to prospective settlers any land selected by the board for settlement;

"To dedicate to public use appropriate tracts for roads, school houses or other public purposes;

"To purchase and acquire under state laws any state, school or granted lands of the state which the board shall determine are available for settlement under the provisions of this act;

"To purchase and acquire lands in co-operation with the United States under such conditions as may be deemed advisable for the purposes of this act, and to convey the same under such conditions and restrictions as may be approved by the secretary of the interior;

"To arrange with the federal government for sharing in the expense of furnishing agricultural training for settlers so as to render them better qualified for the cultivation of their lands, under appropriate conditions of supervision by the federal government;

"To sell and convey such improved farms and farm laborer's allotments subject to the limitations of this act;

"To make such rules and regulations and perform any and all acts as may be necessary and proper for the purpose of carrying out the provisions of this act. . . .

"Sec. 5.   That the board shall give to soldiers the preference right to purchase or lease such farms and farm laborer's allotments.

"A qualified applicant must be a citizen of the United States and must satisfy the board that he is not the holder of agricultural land or possessory rights therein which, together with the land and improvements to be purchased hereunder, shall exceed a value of $15,000.   No purchaser shall at any one time hold more than one farm or farm laborer's allotment.   Every purchaser shall satisfy the board as to his fitness, both financial and otherwise, to cultivate and develop the same successfully.

"Each approved applicant shall enter into a contract of purchase which shall provide for the payment of the

purchase price of the land, the reclamation costs and the farm improvements and other charges, if any, and shall require the purchaser actually to occupy the land within six months and actually to reside thereon for at least eight months in each calendar year for a period of at least five years, unless prevented by illness or other cause satisfactory to the board; and other absence from the land exceeding four months in any calendar year shall be a breach of the contract.

"The contract shall provide that it shall not be assigned without the consent of the board.

"The purchase price of the land shall be paid in annual instalments to be fixed by the board for a total period of not to exceed forty years, with interest on deferred payments from the date of the contract at the rate of four per cent per annum.

"Title to the land shall not pass until full payment has been made for the land and improvements.

"Sec. 6.   The lands disposed of under this act shall be leased or sold, in accordance with regulations adopted by the board, after public notice in at least one newspaper published in the state and of general circulation therein, and one newspaper published in the county where the land is situated, once a week for five consecutive weeks, the first date of publication being at least sixty days prior to the date of lease or sale, setting forth generally the location of the land and the terms of lease or sale and stating that detailed information can be obtained at the office of the board and such other convenient places as are designated in the notice.   .   .   ."

"Sec. 8.   For the purpose of carrying out the provisions of this act relating to acquiring lands and improving the lands of the state, and the lands acquired or taken in trust under the provisions of this act, there is hereby appropriated out of the state reclamation revolving fund the sum of one hundred and fifty thousand dollars ($150,000.00), or so much thereof as may be necessary; for the administrative expenses of the board in carrying out the provisions of this act there is hereby appropriated out of the general fund the sum of ten thousand dollars ($10,000.00), or so much

thereof as may be necessary: Provided, that no warrant shall be drawn upon the state reclamation revolving fund in excess of the amount in the state treasury to the credit of said fund.

"Sec. 9. If any part of this act shall be adjudged to be invalid or unconstitutional, such adjudication shall not affect the validity or constitutionality of the act as a whole, or of the part thereof not adjudged invalid or unconstitutional."

The state reclamation act, Laws of 1919, ch. 158, page 442, provides for the composition and organization of the state reclamation board mentioned in the above quoted portion of § 3 of the land settlement act. The state reclamation act also renders it plain that the state reclamation revolving fund from which the appropriation made by the above quoted § 8 is, and is to become, largely, if not wholly, the product of taxes levied and to be levied upon all property in the state subject to taxation, in the same manner as the state general taxes are levied. In view of the express provisions of § 9, above quoted, we need only concern ourselves in this case with the question of the constitutionality of the act in so far as it authorizes the expenditure of public funds raised by taxation in the purchase by the reclamation board of land to be subdivided, improved and disposed of as provided by the terms of the act, since we do not understand the contention here made in support of the auditor's refusal to issue the warrant as demanded of him to be rested upon any other grounds of unconstitutionality than that the act, in so far as it authorizes the expenditure of public funds raised by taxation, is in excess of legislative constitutional power, in that it is, in effect, an exercise of the power to tax and to expend public funds so raised, for a purpose not public, but private; that is, for a purpose not governmental in the sense that such purpose is not a legitimate function of government.

We must, of course, proceed with our inquiry, having in view the elementary principle that a tax can be lawfully levied, and the public funds so raised lawfully expended, only for a public purpose. The learned author, Gray, in his work entitled "Limitations on Taxing Power," sections 169, 170, well states this elementary principle as follows:

"In all the definitions of taxation and taxes, one element appears most prominently, to wit: the necessity for a public purpose to justify the exercise of the taxing power. No principle of law is better established than this: that taxes can only be laid for public purposes; and that a tax laid for a private purpose or to bestow some private benefit upon some individual or individuals is void, regardless of the absence of express constitutional prohibitions. . . .

"This limitation upon the taxing power is based upon and derived from the inherent purposes of the state as a social organization."

The following authorities, and many others which might be cited, leave no room to doubt this as being a settled rule of American jurisprudence: Judson, Taxation (2d ed.), § 376; Cooley, Taxation (3d ed.), page 181. The guaranty of § 3, article 1, of our state constitution that "no person shall be deprived of life, liberty, or property without due process of law," and the like guaranty of the fourteenth amendment to the constitution of the United States, are manifestly all that this principle needs to rest upon.

Our problem, then, is reduced to this, is the raising of funds by taxation and the expenditure thereof for the purchase of land to the end that it be subdivided, improved and disposed of as by the terms of this act provided, the exercise of the power of taxation and the expenditure of public funds for a public purpose? It may well be doubted that there has ever come to the American courts any more vexatious question than

that of determining whether or not a particular purpose for which public funds were sought to be raised by taxation and expended is a public purpose, when the particular purpose in question lay within that twilight zone wherein the minds may reasonably differ as to such purpose being a public one; the bounds of which zone are ever changing with the passing of time, and within which new problems of public welfare always first appear. That such a question, when arising in the courts, has proven so vexatious is, we apprehend, because of its inherent nature, in that, in its last analysis, it is not one of exclusive legal logic, but is one more or less of policy and wisdom, properly determinable in the light of public welfare, present and future, in a broad sense; and hence is not a pure judicial law question, except in those cases clearly outside of the twilight zone we have alluded to.

Some fifty years ago it became a much debated question in this country as to whether or not the levying of a tax and the expenditure of public funds raised thereby for the purpose of construction, or to aid in the construction, of a railroad in a state or a community of the people so taxed was the exercise of the taxing power and the expenditure of public money for a public purpose. Different state courts, the judges of which were counted of eminent legal learning, even in a time of great judges and great lawyers, entertained opposing views upon this question. Touching the real nature of the question, and recognizing that it lies very close to that line of uncertain location dividing judicial from legislative functions, in a decision holding that such purpose was public, or rather that the court could not say that it was not public when the legislature authorizing the levy of the tax for the purposes had, in effect, determined that it was public, Justice Ladd, speaking

for the New Hampshire court, in *Perry v. Keene,* 56 N. H. 514, 531, said:

"Where is the line that divides the province of the court from that of the legislature in a matter of this sort? The court is to expound and administer the laws, and there the judicial function and duty end. How much of the question, whether a given object is public, lies within the province of the law, and how much in the domain of political science and statesmanship? When the judge has declared all the law that enters into the problem, how much is still left to the determination of the legislator? Admitting, as has indeed been more than intimated in this state *(Concord Railroad v. Greeley,* 17 N. H. 57), that it is for the court finally to determine whether the use is public—what is the criterion? What are the rules which the law furnishes to the court wherewith to eliminate a true answer to the inquiry? In what respect does the question as presented to the court differ from the same question as presented to the legislature? If the courts stop when they reach the borders of legislative ground, how far can they proceed?

"If the legislature should take the property of A, or the property of all the tax-payers in the town of A, and hand it over, without consideration, without pretence of any public obligation or duty, to B, to be used by him in buying a farm, or building a house, or setting himself up in business, the case would be so clear that the common-sense of every one would at once say the limits of legislative power had been overstepped by a taking of private property, and devoting it to a private use. That is the broad ground upon which such cases as *Allen v. Jay,* 60 Me. 124; *Lowell v. Boston,* 111 Mass. 454, and *The Citizens' Loan Association v. Topeka,* Sup. Ct. U. S. (not yet reported) were decided. And yet, what rule of law do the courts find to aid them in thus revising the judgment of the legislature? Is it not clear that the question they pass upon is the same question as that decided by the legislature, and that they must determine it in the same way the legislature have done, simply by the exercise of reason and judgment? What is it that settles the character of a

given purpose, in respect of its being public or otherwise? It has been said that for the legislature to declare a use public does not make it so—17 N. H. 57; and the same may certainly be said with equal truth of a like declaration by the court. A judicial christening can no more affect the nature of the thing itself, than a legislative christening. Judging *a priori,* and without some knowledge of the wants of mankind when organized in communities and states, I do not quite understand how it could be predicated of any use, that it is *'per se'* public, as is said by Dixon, C. J., in *Whiting v. Sheboygan Railway Co.,* 9 Am. Law Reg. (N. S.) 161. Of light, air, water, etc., the common bounties of providence, it might, indeed, be said beforehand that they are in a very broad sense public; but it is not of such uses that we are speaking. Without knowledge of human nature, knowledge derived from experience and observation of what may be needful for the comfort, well-being, and prosperity of the people of the state advanced in civilization—and knowledge, gained in the same way, as to what necessary conditions of their welfare will be supplied by private enterprise, and what will go unsupplied without interference by the state—I do not see how any use could be said to be *per se* public, or how either a legislature, or a court, could form a judgment that would not be founded almost wholly upon theory and conjecture. No one doubts that the building and maintaining of our common highways is a public purpose. Why? Certainly for no other reason than that they furnish facilities for travel, the transmission of intelligence, and the transportation of goods. But why should the state take this matter under its fostering care, imposing upon the people a very great yearly burden in the shape of taxes for their support, any more than many others that might be mentioned, of equal and perhaps greater importance to its citizens? Is it of greater concern to the citizen that he should have a road to travel on, when he desires to visit his neighbor in the next town, or transport the products of his farm or of his factory to market and bring back the commodities for which they may be exchanged, than that he should have a mill

to grind his corn—a tanner, a shoemaker, and a tailor to manufacture his raw materials into clothing, wherewith his body may be covered? Doubtless highways are a great public benefit. Without them I suppose the whole state would soon return to its primal condition of a howling wilderness, fit only for the habitation of wild beasts and savages. How would it be if there were no mills for the manufacture of lumber, no joiners or masons to build houses, no manufacturers of cloth, no merchants or tradesmen to assist in the exchange of commodities? These suppositions may appear somewhat fanciful, but they illustrate the inquiry, Why is the building of roads to be regarded as a public service, while many other things equally necessary for the upholding of life, the security of property, the preservation of learning, morality, and religion, are by common consent regarded as private, and so left to the private enterprise of the citizens? The answer to this question, surely, is not to be found in any abstract principle of law. It is essentially a conclusion of fact and public policy, the result of an inquiry into the individual necessities of every member of the community (which in the aggregate show the character and urgency of the public need), and the likelihood that those necessities will be supplied without interference from the state. Obviously it bears a much closer resemblance to the deduction of a politician, than the application of a legal principle by a judge.  .  .  .

"Enough has been said to show the delicate nature of the task imposed upon the court when they are called upon to revise the judgment of the legislature in a matter of this description. It is especially delicate for two reasons—first, because the discretion of the legislature, with respect to the whole subject of levying taxes, is so very large, and their power so exclusive, that it is not always easy to say when the limits of that discretion and power have been passed; and, second, because the rule to be applied is furnished, not so much by the law as by those general considerations of public policy and political economy to which allusion has been made. I do not deny the power and duty of the court, when private rights of property are in ques-

tion, to settle those rights according to a just interpretation of the constitution; and the discharge of that duty may involve a revision of the judgment of the legislature upon a question which, like this, partakes more or less of a political character. But before the court can reverse the judgment of the legislature and the executive, and declare a statute levying or authorizing a tax to be inoperative and void, a very clear case must be shown.

"After the legislature and the executive have both decided that the purpose for which a tax is laid is public, nothing short of a moral certainty that a mistake has been made, can, in my judgment, warrant the court in overruling that decision, especially when nothing better can be set up in its place than the naked opinion of the court as to the character of the use proposed."

These observations of that learned justice, though made in the centennial year of our independence, nearly a half century ago, near the beginning of the expansion of governmental activities in the interest of public welfare, are, we apprehend, as illuminating, touching the real nature of our present problem, as can be found in our legal literature. Plainly, since a correct solution of our present problem, because of its inherent nature, calls for the consideration of something more than pure legal principles, suggests that we exercise a great degree of caution to the end that we shall not usurp powers which do not constitutionally belong to us. This court has adhered steadfastly to the general rule, in common with other courts of our country, that a statute cannot be declared unconstitutional unless it clearly so appears. Is not this rule of peculiar force in its application to the question of whether or not a legislative act authorizing the levy of a tax and the expenditure of public moneys so raised is for a public purpose? We are decidedly of the opinion that it is.

Having, we think, with a fair degree of success ascertained the real nature of our inquiry, and the de-

gree of caution we are to exercise looking to the avoid-
ance of the usurpation of powers of a coordinate branch
of the state government, the legislature, let us inquire
what are the considerations to be noticed as determin-
ative of this case.  It would be of little aid here to
review the decisions of the courts with a view to merely
ascertaining what particular purposes have been held
to be public, and what particular purposes have been
held not to be public.  We would be but lead into a
maze of conflict in the holdings touching the particular
purposes involved in the reported decisions; and we
may add, we think, also, into a maze of conflicting
theories upon which such decisions are rested.  In so
far, therefore, as we shall notice the decisions and
other authorities, it will be to the end that we have
brought to our attention the broad general considera-
tions which have influenced the courts in deciding the
questions of public use in the particular cases brought
before them, especially in recent years.

In *Sun Printing & Publishing Ass'n v. New York,*
8 App. Div. 230, 235, 40 N. Y. Supp. 607, Justice
Barrett, speaking for the court, in holding that the
construction, by the expenditure of public funds raised
by taxation, of a city railway, to be operated by others
under a lease from the city, did not constitute the ex-
ercising of the taxing power for a purpose not public,
observed:

"No test is furnished in the case cited for determin-
ing the precise scope of municipal action, and none has
been suggested to us which is in any way satisfactory.
In considering this question it must be premised that
cities are not limited to providing for the strict neces-
sities of their citizens.  Under legislative authority,
they may minister to their comfort, health, pleasure
or education.  They are not limited to policing the
city, to paving its streets, to providing it with light,
water, sewers, docks and markets.  They may also be

required by the sovereign power to furnish their citizens with schools, hospitals, dispensaries, parks, libraries and museums, with zoological, botanical and other gardens. They may thus even gratify our ears with music of a summer afternoon, or minister to our comfort by providing us with public baths. Expenditures in all these directions under legislative authority have never been questioned. Where, then, shall we draw the line? It would be very simple to draw it at those purposes for which precedent in the past can be found, and to exclude all others. This test should be easy of application, but would be essentially vicious and erroneous. Growth and extension are as necessary in the domain of municipal action as in the domain of law. New conditions constantly arise which confront the legislature with new problems. As the structure of society grows more complex, needs spring up which never existed before. These needs may be so general in their nature as to affect the whole country or the whole State, or they may be local and confined to a single county or municipality. In any case, it is the duty of that legislative body which has the power and jurisdiction to apply the remedy. To hold that the Legislature of this State, acting as the *parens patriae,* may employ for the relief and welfare of the inhabitants of the cities of the State only those methods and agencies which have proved adequate in the past would be a narrow and dangerous interpretation to put upon the fundamental law. No such interpretation has thus far been placed upon the organic law by the courts of this State. Whenever the question has been considered, it has been universally treated in the broadest spirit.''

The judgment rendered by the appellate division of the supreme court on that case was thereafter affirmed by the court of appeals. *Sun Printing & Publishing Ass'n v. New York,* 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788.

In *Laughlin v. Portland,* 111 Me. 486, 90 Atl. 318, Ann. Cas. 1916C 734, 51 L. R. A. (N. S.) 1143, there

was involved the question of the city of Portland exercising its taxing power in bringing about the establishment and operation of a municipal fuel yard, for the purpose of selling fuel to its inhabitants. In holding that such exercise of power was for a legitimate municipal purpose, that is, a public purpose, it being authorized by an act of the legislature, Justice Cornish, speaking for the court, made the following pertinent general observations:

"The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes because it would be impossible to do so. Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary. What was clearly a public use a century ago, may, because of changed conditions, have ceased to be such today. Thus the mill act which came into being in the early days of our parent Commonwealth of Massachusetts, and was adopted by our own state, was upheld as constitutional because of the necessities of those primitive times. The courts in later days have strongly intimated that were it an original question it might be difficult to sustain it in view of present industrial conditions. *Murdock v. Stickney,* 8 Cush. 113; *Salisbury v. Forsaith,* 57 N. H. 124; *Jordan v. Woodward,* 40 Maine, 317.

"On the other hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now."

The decision of the state court in that case was thereafter approved by the supreme court of the United States (*Jones v. Portland,* 245 U. S. 217, Ann. Cas. 1918E 660), the question of the purpose being public being reviewed by that court in the light of the

due process of law guaranty of the fourteenth amendment to the Federal constitution.

In Gray, Limitation of Taxing Power, at § 176, it is said:

"It is not possible to lay down any hard-and-fast rule by which to determine which purposes are public and which private. Hardly any project of public benefit is without some element of peculiar personal profit to individuals, hardly any private attempt to use the taxing power is without some colorable pretext of public good. Each case must be judged on its own facts, and any attempt at fixed definition must result in confusion and contradictions.

"The custom of the government and the community is, perhaps, as definite a guide as can be indicated."

Omitting the first sentence, we quite agree with this statement of the learned author, but the suggestion that "custom" may be a true guide, it seems to us, leads us nowhere except to stagnation. This, it seems to us, would be wholly out of harmony with the thought permeating all of the later decisions, that new conditions and new public necessities are weighty considerations in determining the question of public purpose. For if custom is to be the controlling factor in deciding the question, then the consideration of new conditions and new necessities are of little moment in deciding the question. We are impressed with the observations touching custom as a guide made by Chester Collins Maxey in an article to be found in the January-February, 1918, number of the American Law Review, at pages 215, 219 as follows:

"The usage rule settles nothing. If it be rigidly applied, it precludes all possibility of growth and progress in this branch of the law; if, on the contrary, it be liberally construed, it reveals the courts exercising the very discretion which they doubtless employed it to conceal. No one is surprised, therefore, that in

later cases the courts are found with very little to say about settled usage and very much to say about the necessity of recognizing growth in matters of government and law, and of the deference to be paid to legislative determinations of public purpose.''

We feel certain that these considerations, general as they are, lead irresistably to the conclusion that the question of public purpose involved in this case, because of its inherent nature, because of the opportunity for difference of opinion as to whether or not the purpose is public in the sense of it being a legitimate function of government, and because of the question of public policy necessarily involved in it, is one which we are not permitted to render a different decision upon than that rendered by the legislature. Is there not abundant room for arguing that the development of our unoccupied lands suitable for agriculture, by a land policy which would encourage the settlement thereon of home owning farmers, will materially contribute to the welfare of our people as a whole? Can it not be argued with a fair show of reason that not only will such a policy ultimately lead to the enhancement of the material wealth of the state, but that it will also make for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism? In the light of the debatable character of these questions, we are quite convinced that it is not within the province of the judicial branch of our state government to answer them in the negative. Our decision sustaining the workmen's compensation act of 1911, in *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, 2 N. C. C. A. 823, 3 N. C. C. A. 599, seems quite in harmony with, and to lend support to, the conclusion we here reach.

Some contention is made rested upon the theory that this act discriminates in favor of agriculture as against other industries. This, to our minds, is no argument against its constitutionality, since it cannot be said that the legislature has wrongly decided that to so encourage agricultural development in our state will promote its public welfare. It hardly needs argument to demonstrate that no other industry is so closely related to the welfare of the people as a whole.

Some contention is made that the law is unconstitutional in that it violates the equal privileges and immunities guaranty of our constitution, because it contemplates, in the disposition of the lands, the giving of preference rights to soldiers. All arguments that could be made against the law upon this ground could, with equal force, be made against every pension law that was ever enacted by the Congress of the United States, or any of the states. Manifestly this contention is without merit.

The contention that the law violates the fourteenth amendment of the Federal constitution, we think, is answered by what we have already said. We must concede that the question of whether or not the tax is levied for a public use is a Federal as well as a state question. To take property by taxation for other than a public purpose is as much a violation of the due process of law guaranty of the fourteenth amendment to the Federal constitution as of any similar provision of the state constitution. This is made plain by the decision of the supreme court of the United States in *Olcott v. Supervisors,* 83 U. S. 678.

We are quite convinced that we are not privileged to now decide that this tax, and the expenditure of public funds raised thereby, is for other than a public purpose, the legislature having decided that it is for a

public purpose, which decision not being manifestly wrong, the writ will issue as prayed for.

TOLMAN, BRIDGES, MITCHELL, MAIN, and FULLERTON, JJ., concur.

MACKINTOSH, J. (dissenting)—As I gather the gist of my brother Parker's opinion, it is that the court will not declare unconstitutional an act which calls for the collection of taxes to be used in the purchase and improvement of lands to be sold to private individuals, for the reason that the legislature has decided that such taxation is for a public purpose. . Courts have found this an easy way to justify the laying of taxes to be utilized in ways that appeal to them as beneficial or agreeable to their ideas of proper commercial or economic development. The purpose of the act may be highly commendable, and did it not call for the payment from the pockets of the taxpayer of money in the possession of which he is supposed to be protected by constitutional limitations, as a land development plan, it would merit the approval of those interested; but to call it a public purpose is to stretch to the breaking point all fundamental ideas of what is meant by that term.

In *Lowell v. Boston,* 111 Mass. 454, 15 Am. Rep. 39, an act was declared unconstitutional which authorized Boston to bond itself for $20,000,000, to be loaned to the owners of land, the buildings upon which had been destroyed by fire, for the purpose of rebuilding the city. Repayment was secured by mortgages. The court said:

"The power of government, thus instituted to affect the individual in his private right of property whether by enacting contributions to the general means, or by sequestration of specific property, is confined, by obvious implication as well as by express terms, to pur-

poses and objects alone which the government was established to promote, to wit, public uses and the public service. This power, when exercised in one form, is taxation; in the other, is designated as the right of eminent domain. The two are diverse in respect of the occasion and mode of exercise, but identical in their source, to wit, the necessities of organized society; and in the end by which alone the exercise of either can be justified, to wit, some public service or use. It is due to their identity in these respects that the two powers, otherwise so unlike, are associated together in the same article. So far as it concerns the question what constitutes public use or service that will justify the exercise of these sovereign powers over private rights of property, which is the main question now to be solved, this identity renders it unnecessary to distinguish between the two forms of exercise, as the same tests must apply to and control in each. An appropriation of money raised by taxation, or of property taken by right of eminent domain, by way of gift to an individual for his own private uses exclusively, would clearly be an excess of legislative power.''

In another portion of the same opinion it is said:

''The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money

raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion. The principle of this distinction is fundamental. It underlies all government that is based upon reason rather than upon force. It is expressed in various forms in the Constitution of Massachusetts.''

See, also, *Olcott v. Supervisors,* 83 U. S. 678; *Citizens' Savings & Loan Association v. Topeka,* 87 U. S. 655; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 94 N. W. 50, 99 Am. St. 985, 61 L. R. A. 345; *Auditor of Lucas County v. State ex rel. Boyles,* 75 Ohio St. 114, 78 N. E. 955, 7 L. R. A. 1196; *State ex rel. Walton v. Edmondson,* 89 Ohio St. 351, 106 N. E. 41; *State ex rel. Griffith v. Osawkee Township,* 14 Kan. 418, 19 Am. Rep. 99; *State ex rel. Garth v. Switzler,* 143 Mo. 287, 45 S. W. 245, 65 Am. St. 653, 40 L. R. A. 280; *City of Geneseo v. Geneseo Natural Gas, Coal, Oil, Salt & Mineral Co.,* 55 Kan. 358, 40 Pac. 655; *In re House,* 23 Colo. 87, 46 Pac. 117, 33 L. R. A. 832; *City of Baltimore v. Keeley Institute,* 81 Md. 106, 31 Atl. 437, 27 L. R. A. 646; *Mayor, etc., of Jersey City v. New Jersey R. Co.,* 78 N. J. L. 72, 73 Atl. 609; *Fox v. Mohawk & H. R. Humane Soc.,* 165 N. Y. 517, 59 N. E. 353, 80 Am. St. 767, 51 L. R. A. 681; *State ex rel. Board of Control of St. Louis School and Museum of Fine Arts v. St. Louis,* 216 Mo. 47, 115 S. W. 534; *Feldman v. City Council of Charleston,* 23 S. C. 63, 55 Am. Rep. 9; *Aetna Fire Ins. Co. v. Jones,* 78 S. C. 445, 59 S. E. 148, 125 Am. St. 818, 13 L. R. A. (N. S.) 1147; *Trustees of Brooke Academy v. George,* 14 W. Va. 420, 35 Am. Rep. 672; *Minnesota Sugar Co. v. Iverson,* 91 Minn. 30, 97 N. W. 454.

It is needless to prolong a discussion already too ambiguous. On principle, and under the authorities, I cannot agree that a public purpose is being served ·by this attractive bit of paternalistic legislation, and therefore dissent.

Mount, J., concurs with Mackintosh, J.

Holcomb, C. J. (concurring)—The purpose of the reclamation act, as set forth therein, is the settlement of undeveloped lands. The settlement and. development of unimproved lands for agricultural purposes is certainly a public benefit. It means a direct increase in production of food stuffs and an indirect increase in industry within the state. That the state generally will receive a benefit, it seems to me there can be little doubt.

The fact that benefits will inure to certain classes of citizens within the state does not lessen the public benefit that will result from the operation of the statute. The benefit received by a class of citizens does not destroy the primary purpose the legislature had in enacting the statute to increase the agricultural products of the state and make productive lands heretofore unproductive.

Distinction can be made between the present case and *Lowell v. Boston,* 111 Mass. 454, 15 Am. Rep. 39, quoted from in the dissenting opinion filed herein. There the purpose of the statute was to raise funds to be loaned to owners of land, the buildings upon which had been destroyed. The purpose in that case was to rebuild a devastated portion of a city. It was peculiarly a private benefit, although to a large number of inhabitants. It is not difficult to understand that the benefits to be derived from the expenditure of money in that case could hardly be conceived as belonging to

the public generally. While there might be a remote public benefit, there hardly could be such a direct and general one as under the statute here in question.

For the above reasons, I concur with the majority.