124

W. H. H. CHAMBERLIN, INC., Plaintiff, *v.* ELMER F. ANDREWS, Industrial Commissioner of the State of New York, and Another, Defendants.*

E. C. STEARNS & COMPANY, Plaintiff, *v.* ELMER F. ANDREWS, Industrial Commissioner of the State of New York, and Another, Defendants.

Supreme Court, Onondaga County, February 28, 1936.

* See *Associated Industries of New York State* v. *Department of Labor* (158 Misc. 350).

*Brown, Fraser & Black* [*Henry S. Fraser* of counsel], for the plaintiffs..

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor General,* and *John F. X. McGohey, John C. Crary* and *Colin McLennan, Assistant Attorneys-General,* of counsel], for the defendants.

*Kenefick, Cooke, Mitchell, Bass & Letchworth* [*James McCormick Mitchell* of counsel], for the Associated Industries of New York, Inc., *amicus curiæ.*

DOWLING, J. By chapter 468 of the Laws of 1935, effective April 25, 1935, the Legislature of the State of New York amended the Labor Law "by inserting therein a new article, to be article eighteen," entitled "Unemployment Insurance Fund." This enactment followed upon the report of the Joint Legislative Committee on Unemployment appointed pursuant to a joint resolution of the Legislature of the State of New York April 9, 1931.

In 1935 the Congress of the United States enacted a "Federal Social Security Act" (49 U. S. Stat. at Large, 620; U. S. Code, tit. 42, §§ 1301–1305) "To provide for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several States to make more adequate provision for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their

unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes." This act was passed after April 25, 1935, and was approved by the President August 14, 1935, effective upon that date.

The New York act requires employers, with certain exceptions, of four or more persons to pay " contributions " based upon their payrolls into a central pool known as the " Unemployment Insurance Fund."

By the Federal Social Security Act there was established in the Treasury of the United States a trust fund to be known as the " Unemployment Trust Fund " (§ 904; U. S. Code, tit. 42, § 1104). The New York act requires the Industrial Commissioner immediately to deposit contributions received by him in the " ' Unemployment Trust Fund ' of the United States government or its authorized agent, so long as said trust fund exists " (§ 515, subd. 3). The Secretary of the Treasury of the United States is directed to receive and hold, in said fund, all moneys deposited by a State agency from a State unemployment fund. The Federal act also provides that the Secretary of the Treasury shall invest contributions received from the States by him as a single fund, in interest-bearing obligations of the United States, or in obligations guaranteed as to both principal and interest by the United States, but only so much of the fund may be so invested as is not required to meet current withdrawals by the States. The Secretary of the Treasury is required to keep a separate book account for each State agency and to pay over to any State agency such amounts as such agency may requisition, not exceeding the amount standing to its credit at the time of the payment. The New York act empowers the State Industrial Commissioner to requisition from the Federal unemployment trust fund needed amounts from time to time. These allotments are paid by the Treasurer of the United States to the New York State Commissioner of Taxation and Finance, who is designated as the custodian of such funds. The distribution of such funds is made under the direction of the New York State Industrial Commissioner. The persons who ultimately receive these funds are designated in the New York act as " unemployed employees."

Under the New York act, employers of four or more persons pay one per cent of their payrolls into the unemployment insurance fund for the year 1936, two per cent for the year 1937, and three per cent for the year 1938 and succeeding years. The Federal act also levies upon employers throughout the United States, with certain exceptions, of eight or more persons, an excise tax based upon payrolls. (U. S. Code, tit. 42, § 1101 et seq.) Under the Federal act (U. S. Code, tit. 42, § 1102), the taxpayer may credit against the

Federal tax paid by him, up to ninety per cent thereof, the amount of contributions which he has paid during the particular year into his State unemployment fund, provided his State act shall have been previously approved by the Social Security Board created pursuant to the Federal act. (New York act was approved by the Social Security Board January 30, 1936.)

Plaintiff E. C. Stearns & Co. is a domestic corporation, of Syracuse, N. Y., " engaged in the manufacture and sale of hardware specialties, including hand and power lawn mowers and in the carrying on of a foundry and machine shop and has employed under contract of hire more than two hundred persons in its business for more than fifty calendar weeks in the year 1935."

Plaintiff W. H. H. Chamberlin, Inc., is a domestic corporation of Syracuse, N. Y., " engaged in the wholesale and retail stationery, printing, book-binding, engraving and lithographing business and has employed under contract of hire more than fifty persons in its business for more than fifty calendar weeks in the year 1935."

The employees of both plaintiffs were employed in Syracuse, N. Y., at manual labor, or at other than manual labor at a rate of wages of less than $2,500 a year and of less than $50 a week. All of the employees of plaintiffs are employed within and reside within the State of New York and are still employed by the plaintiffs and have been employed by them subsequent to January 1, 1936, and plaintiffs intend to continue in and to conduct their business indefinitely. Both plaintiffs are employers within the provisions of article 18 of the Labor Law and, as such, are required to pay contributions into the State unemployment insurance fund on their payrolls, amounting to one per cent thereof for the year 1936. Both plaintiffs alleged they do not intend to pay the tax accruing under the New York act, and they allege defendants are planning to enforce payment thereof against them. Plaintiffs seek judgment declaring said State act to be unconstitutional and void.

Defendants admit all of the material allegations of the complaints, except that article 18 of the Labor Law is unconstitutional and void. They pray judgment in each case declaring article 18 of the Labor Law to be constitutional and valid and for dismissal of the complaints upon the merits.

The sole question involved in these actions is the constitutionality of chapter 468 of the Laws of 1935 of the State of New York. No issue of fact is present. (At least, the parties so agreed upon the argument.) The pleadings in both actions pray for a declaratory judgment as to the validity of said enactment. Plaintiffs alone move for judgment on the pleadings under rule 112 of the Rules of Civil Practice. The court should take jurisdiction when con-

stitutional questions are involved although the action is for a declaratory judgment. " The question involved here is one of constitutional construction. An actual controversy exists. This court, therefore, has the power to declare the rights of the parties." . (*Wingate* v. *Flynn*, 139 Misc. 779, 781; affd., 233 App. Div. 785; affd., 256 N. Y. 690.) A constitutional question may be raised by motion. (*People* v. *Ostrander*, 144 App. Div. 860.)

Plaintiffs maintain that the New York act is repugnant to both the New York and the United States Constitutions, and particularly to section 6 of article 1 of the State Constitution and to the Fourteenth Amendment of the Federal Constitution, in that said act deprives them " and many other persons of liberty and property without due process of law."

Section 6 of article 1 of the New York Constitution provides that " no person shall * * * be deprived of life, liberty or property without due process of law." Section 1 of the Fourteenth Amendment of the Constitution of the United States provides " nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Plaintiffs and *amicus curiæ* challenge the constitutionality of the New York act on the grounds:

1. " The Unemployment Insurance Law is unconstitutional because the necessary effect of its operation and enforcement will be to deprive every employer subject to the law of his property without due process of law, in violation of the provisions of article 1, section 6, of the Constitution of the State of New York and in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States."

2. " The Unemployment Insurance Law is unconstitutional because the necessary effect of its operation and enforcement will be to deny to every employer subject to the law the equal protection of the laws, in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States."

3. " The Unemployment Insurance Law is unconstitutional because the necessary effect of its operation and enforcement will be to deprive every employer subject to the law of his liberty, in the sense of his freedom of contract, in violation of the provisions of article 1, section 6, of the Constitution of the State of New York, and in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States."

4. " This legislation cannot be justified under the taxing power, because that power can only be exercised for public as distinguished from private purposes, and this statute directs a taking for essentially private purposes."

5. " This legislation involves arbitrary, discriminatory, and unreasonable classifications for taxing purposes, and therefore deprives the plaintiffs of their property without due process of law and withholds from them the equal protection of the laws."

6. " This legislation is not justified by a resort to the police power."

Defendants maintain the act is constitutional on the following grounds:

1. " The underlying facts, as established, force the conclusion that adoption of an insurance medium to mitigate the economic and social evils of unemployment is a public welfare purpose and therefore proper for State legislative action within the requirements of due process."

2. " The use of the taxing power and the imposition of its burden upon a general group or class for a recognized proper public purpose is established by a long line of decided cases, both Federal and State."

3. " Analysis of the provisions of the statute discloses no feature which is not within the requirements of due process."

We should envisage the facts the Legislature had in mind when it enacted this statute that we may better understand " the purpose sought to be effected and the evils sought to be remedied." Obviously, then, we should inquire into the extent, causes and effects of unemployment in this and other countries. (*Muller* v. *Oregon*, 208 U. S. 412; 28 S. Ct. 324; 52 L. Ed. 551; *Bunting* v. *Oregon*, 243 U. S. 426; 37 S. Ct. 435; 61 L. Ed. 830; *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210; 29 S. Ct. 67; 53 L. Ed. 150; *Chastleton Corporation* v. *Sinclair*, 264 U. S. 543; 44 S. Ct. 405; 68 L. Ed. 841.)

A study of the economic brief submitted by the defendants compels the conclusion that unemployment is of ancient origin; that periods of depression follow each other with almost measured regularity; that " the number of those stranded in the backwash from each succeeding cycle of depression has constantly increased; " that the employable population has augmented faster than the needs for labor even in the most prosperous times; that, in the present depression, the number of employable persons unable to procure work exceeds any previous experience, with the result that an unbearable burden has been laid upon the shoulders of the taxpaying public, its purchasing power impaired, and the depression itself prolonged.

Inherent in industry, the world over, are the causes of unemployment, such as seasonal needs, style changes, shifting markets and distribution centers, mechanical improvements, overproduction,

casual and seasonal labor, and the unbalance of supply and demand. These causes are " complex, interdependent and unpredictable." Traced they cannot be to particular plants or to particular industries. All who use the labor supply contribute to the aggregate of the problem. In time and place, in all employments and among all employers, the problem of unemployment is a common one. Heretofore, in this country at least, legislator and economist alike have been unable by code or nostrum to stem the tide. The act in question is a step in that direction.

It is important to note what measures other States of the Union and other countries have adopted similar to the one under review.

In 1905 a Royal Commission was created in England to study the subject of poor relief administration. In 1909 the Commission reported in favor of establishing some kind of a voluntary system of unemployment insurance stimulated by a public subsidy. (Poor Law Report, 1909, part VI, chap. 4, § 594.) In 1911 Parliament enacted a compulsory law (1 & 2 Geo. V, 1911, chap. 55), limited to a few traders, to provide a small benefit for unemployed workers in these industries. To the fund provided for in this statute employers, employees and the government were required to contribute. In 1919 the surplus in this fund had reached £18,000,000. In 1920 the scope of the act was enlarged to include workers between the ages of sixteen and sixty-five in nearly all the principal industries of England, except agriculture and domestic service. By November, 1921, payments to unemployed workers had so multiplied due to increased unemployment, that the fund had been reduced to £100,000. The fund then began borrowing from the treasury. In July, 1923, it owed the treasury £16,000,000. In March, 1933, the debt had increased to £115,000,000. But England still retains the system. Sir William Beveridge, director of the London School of Economics and Political Science, says: " The insurance fund has become undistinguishable from the national exchequer." (Minutes of Evidence, Royal Com. on Unemployment Insurance, Paper No. 42, p. 722.)

France, before the World war, established a voluntary system of unemployment insurance. After the war, Belgium, Czechoslovakia, Denmark, Finland, Netherlands, Norway and Spain adopted voluntary unemployment acts, while Austria, Bulgaria, Germany, Italy and Poland set up compulsory systems, and Switzerland a mixed system varying in the different cantons.

According to the United States Department of Labor, Bureau of Labor Statistics (Bulletin No. 544 [1931], pp. 177, 178); Operation of Unemployment Insurance Systems in the United States and Foreign Countries, United States Department of Labor, Bureau of

Labor Statistics ([1934] p. 56 *et seq.*) these systems differ greatly from each other in " coverage, methods of contributions, amount and character of benefits, provisions for emergency benefits, method of administration, etc.," and are alike only in their objective, " the relief of the evils of unemployment through some form of insurance."

In 1932 Wisconsin passed an unemployment insurance law. In 1935 Utah, Washington, New Hampshire, California, Massachusetts, Alabama and Oregon followed the lead of Wisconsin, and Congress brought the District of Columbia into line. New York was the third State to adopt an unemployment insurance act.

The ultimate fate of the experiment in this field of legislation cannot as yet be foreseen. It is important to note, however, that many civilized nations believe that unemployment insurance offers some measure of protection against the scourge of unemployment.

A brief survey of the provisions of the New York and Federal acts is necessary that we may better understand the arguments advanced for and against its constitutionality and the issues involved in this litigation.

Contributions to the State fund are required from every employer who has employed at least four persons in any employment subject to the statute within each of thirteen, or more, calendar weeks in the year 1935, or any subsequent calendar year, provided that such employment, in 1935, shall make an employer subject, on January 1, 1936, and such employment, in any subsequent year, shall make a newly-subject employer subject for all purposes as of January first of the calendar year in which such employment occurs. (§ 502, subd. 3.)

Employment subject to the article does not include: (1) Employment as a farm laborer. (2) Employment by an employer of his spouse or minor child. (3) Service performed in the employ of a corporation, community chest fund or foundation, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. Employers subject to said article do not include: (1) The State of New York, municipal corporations or other governmental subdivisions of the State. (§ 502, subd. 3.) (2) The government of the United States or any Federal agency in the State of New York.

Employers subject to the law are required, on and after the 1st day of January, 1936, to pay contributions. (§ 515.)

Subdivision 3 of section 515 provides: " All contributions paid under this article shall upon collection be deposited in or invested in the obligations of the ' Unemployment Trust Fund ' of the United States government or its authorized agent, so long as said trust fund

exists, notwithstanding any other statutory provision to the contrary. The commissioner shall requisition from the unemployment trust fund necessary amounts from time to time."

Section 904 of the Federal Security Act (U. S. Code, tit. 42, § 1104, which became a law August 14, 1935) provides:

" (a) There is hereby established in the Treasury of the United States a trust fund to be known as the ' Unemployment Trust Fund,' hereinafter in this title called the ' Fund.' The Secretary of the Treasury is authorized and directed to receive and hold in the Fund all moneys deposited therein by a State agency from a State unemployment fund. Such deposit may be made directly with the Secretary of the Treasury or with any Federal reserve bank or member. bank of the Federal Reserve System designated by him for such purpose.

" (b) It shall be the duty of the Secretary of the Treasury to invest such portion of the Fund as is not, in his judgment, required to meet current withdrawals. Such investment may be made only in interest bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. For such purpose such obligations may be acquired (1) on original issue at par, or (2) by purchase of outstanding obligations at the market price. The purposes for which obligations of the United States may be issued under the Second Liberty Bond Act, as amended [section 752 of title 31], are hereby extended to authorize the issuance at par of special obligations exclusively to the Fund. Such special obligations shall bear interest at a rate equal to the average rate of interest, computed as of the end of the calendar month next preceding the date of such issue, borne by all interest-bearing obligations of the United States then forming part of the public debt; except that where such average rate is not a multiple of one-eighth of 1 per centum, the rate of interest of such special obligations shall be the multiple of one-eighth of 1 per centum next lower than such average rate. Obligations other than such special obligations may be acquired for the Fund only on such terms as to provide an investment yield not less than the yield which would be required in the case of special obligations if issued to the Fund upon the date of such acquisition.

" (c) Any obligations acquired by the Fund (except special obligations issued exclusively to the Fund) may be sold at the market price, and such special obligations may be redeemed at par plus accrued interest.

" (d) The interest on, and the proceeds from the sale or redemption of, any obligations held in the Fund shall be credited to and form a part of the Fund.

" (e) The Fund shall be invested as a single fund, but the Secretary of the Treasury shall maintain a separate book account for each State agency and shall credit quarterly on March 31, June 30, September 30, and December 31, of each year, to each account, on the basis of the average daily balance of such account, a proportionate part of the earnings of the Fund for the quarter ending on such date.

" (f) The Secretary of the Treasury is authorized and directed to pay out of the Fund to any State agency such amount as it may duly requisition, not exceeding the amount standing to the account of such State agency at the time of such payment."

Section 529 of the State act provides: " The unemployment insurance fund established by this article shall be the sole and exclusive source for the payment of benefits payable hereunder, and such benefits shall be deemed to be due and payable only to the extent that contributions, with increments thereon, actually collected and credited to the fund and not otherwise appropriated and/or allocated, are available therefor. The State of New York undertakes the administration of such fund without any liability on the part of the State beyond the amount of moneys received through allotment from the Federal social insurance board or other Federal agency."

Section 516 provides: " The contribution regularly payable by each employer shall be an amount equal to three per centum of the payroll of employees, as herein defined, except that the contribution payable by each employer for the calendar year nineteen hundred thirty-six shall be an amount equal to one per centum of such payroll and for the year nineteen hundred thirty-seven shall be an amount equal to two per centum of such payroll."

Section 518 provides:

" 1. This article shall be administered by the commissioner and for such purpose he shall have power to make all rules and regulations and, subject to the regulations of the civil service, to appoint such officers and employees as may be necessary in the administration of this article.

" 2. The commissioner may create as many employment districts and may establish and maintain as many State employment offices as he deems necessary to carry out the provisions of this article.

" 3. It shall be one of the purposes of this article to promote the regularization of employment in enterprises, localities, industries, and the state. The commissioner shall take such steps as are within his means for the *reduction* and *prevention of unemployment*. To this end the commissioner may employ experts, and may carry on and publish the results of any investigations and research which he deems relevant, whether or not directly related to the other purposes and specific provisions of this article.

" 4. There is hereby created a state advisory council of nine members to be appointed by the governor. * * * The counsel shall investigate and study the operation of this article upon the basis of the actual contribution and benefit experience hereunder with a view *to classifying or grouping employers, employments, occupations or industries with respect to the frequency and severity of unemployment of each, taking due account of any relevant and measurable factors relating thereto, and to report on the practicability of the establishment of a rating system which would most equitably operate to rate the unemployment risk and fix the contribution to such fund for each employer, group of employers, employment, occupation or industry and to encourage the stabilization of employment therein.* In determining the establishment of such rating system it is hereby declared to be the public policy that no rate of contribution on payrolls required from any individual employer shall be less than one per centum. The council shall report its findings and recommendations to the governor and the legislature not later than March first, nineteen hundred thirty-nine." (Italics ours.)

Section 503 provides, in part, that benefits shall be paid from the fund to each unemployed employee entitled thereto, that no employee shall be entitled to any benefits unless he (a) is suffering total unemployment as defined in this article and (b) has, as provided in this article, registered as totally unemployed and reported for work or otherwise given notice of the continuance of his unemployment, and (c) has had not less than ninety days of employment as defined in this article within the twelve months preceding the date on which benefits are to commence, and (d) in no case shall the fund be liable to pay benefits to an employee for any unemployment occurring more than twelve months after the date on which such employee was in employment; (e) the fund shall pay benefits to employees in the ratio of one week of benefit for each fifteen days of employment within the fifty-two weeks preceding the beginning of the payment of benefits; withdrawal of benefits is postponed until two years from the date contributions by employers are first payable.

Section 504 provides, in part, that an employee shall be entitled to benefits on account of unemployment which continues subsequent to a waiting period of three weeks after notification of unemployment; provided that no more than five weeks of unemployment for which no benefit is paid shall be required as a waiting period within any calendar year; that an employee shall not be entitled to benefits except for unemployment which continues subsequent to a waiting period of ten weeks; (a) if he has lost his employment through misconduct in connection with his employment; or (b) if he has lost his employment because of a strike, lockout or other industrial controversy in the establishment in which he was employed.

Section 505 provides, in part, that benefits shall be payable on account of total unemployment after the specified waiting period at the rate of fifty per cent of the employee's full time and weekly wages, but not to exceed a maximum of fifteen dollars and a minimum of five dollars per week.

Section 506 provides that no benefits shall be payable to an employee who refuses to accept an offer of employment for which he is reasonably fitted by training and experience, including employment not subject to this article; provided, however, that no employee otherwise qualified to receive benefits shall lose the right to benefits by reason of a refusal to accept employment if

" (a) acceptance of such employment would either require the employee to join a company union or would interfere with his joining or retaining membership in any labor organization; or

" (b) there is a strike, lockout or other industrial controversy in the establishment in which the employment is offered; or

" (c) the employment is either not within the state or at an unreasonable distance from his residence, or travel to and from the place of employment involves expense substantially greater than that required in his former employment unless the expense be provided for; or

" (d) the wages, hours and conditions offered are substantially less favorable to the employee than those prevailing for similar work in the locality, or are such as tend to depress wages or working conditions."

Section 528 provides, in part:

" 2. Any person who wilfully refuses or fails to pay a contribution to the fund; or

" 3. Any person who refuses to allow the state industrial commissioner or his authorized representatives to inspect his payroll or other records or documents relative to the enforcement of this article; or

" 4. Any employer who shall make a deduction from the wages or salary of any employee to pay any portion of the contribution which the employer is required to make shall be guilty of a misdemeanor. If a corporation is convicted of any such violation, the president, secretary, treasurer or officers exercising corresponding functions, shall each be guilty of a misdemeanor."

Employees whose employer is not subject to the article are not insured by it (§ 502); nor are persons employed in other than manual labor at a rate of wages at more than $2,500 per year or more than fifty dollars per week (§ 502, subd. 2). Benefits become payable only to totally unemployed persons who have registered with the employment office set up in each of the administrative districts (§ 510).

Section 517 provides: " No agreement by an employee to pay any portion of the payment made by his employer for the purpose of providing benefits required by this article, shall be valid and no employer shall make a deduction for such purpose from the wages or salary of any employee."

Section 519 makes the State Commissioner of Taxation and Finance custodian of the fund. Section 520 provides that the fund shall be expended solely for the purpose specified in the act and that all Federal moneys allotted or apportioned to the State by Federal Social Security Act shall be paid in to the unemployment administration fund.

Section 523 provides that the amount due for contribution to the fund, with interest thereon, shall be a lien against the assets of the employer subordinate, however, to claims for unpaid wages and prior recorded liens.

Section 529 provides: " The unemployment insurance fund established by this article shall be the sole and exclusive source for the payment of benefits payable hereunder, and such benefits shall be deemed to be due and payable only to the extent that contributions, with increments thereon, actually collected and credited to the fund and not otherwise appropriated and/or allocated, are available therefor. The State of New York undertakes the administration of such fund without any liability on the part of the state beyond the amount of moneys received through allotment from the federal social insurance board or other federal agency."

Section 530 provides: " If any provision of this article or the application thereof to any person or circumstance, is held invalid, the remainder of the article and the application of such provision to other persons or circumstances, shall not be affected thereby."

Section 531 provides, in part:

" The Legislature reserves the right to amend, alter or repeal any provision of this article; and no person shall be or be deemed to be vested with any property or other right by virtue of the enactment or operation of this article."

" ' Payroll ' shall mean all wages received by employees as defined in subdivision two of section five hundred and two herein from their employer." (§ 502, subd. 7.)

A review of the New York act convinces one that it is a radical departure from the ordinary course of legislation in this State dealing with the relations between employers and employees. The act compels employers in industries to pay an amount equal to three per cent of their payrolls into a fund for the benefit of unemployed employees of all employers affected by the act. It compels the employer who has no unemployed employees to contribute to the

benefits which may be received by unemployed employees of other employers, even though some of them may be his competitors. It compels an employer to contribute to the benefits which may be received by employees who have been discharged by himself, or other employers, for incompetency, sabotage or theft, and to contribute to the benefits which may be received by employees on strike without just cause. It compels employers to contribute to unemployed employees who may not be in need of any benefits whatever. It compels employers to contribute to the benefits which may be received by the unemployed employees of employers who are forced into bankruptcy. The act does not classify employees, employers or industries, although there is a provision for a possible classification in the future. The act does not, in terms, provide for any monetary compensation to employers for the contributions they are required to make from their private funds. The act makes unpaid contributions a lien upon the property· of employers subject to unpaid wages and existing liens. The act imposes severe penalties for a willful neglect to make the contributions required by it. The act imposes no responsibility upon the State outside of the administration of the fund itself. The act provides that the contributions paid into the insurance fund shall be forwarded to the Secretary of the Treasury of the United States and without the jurisdiction of the State. The act forbids employers and employees from agreeing that any part of the three per cent payroll contribution shall be borne by employees. The act requires no contribution from employees or from the State.

That the act is novel, revolutionary and unusual cannot be disputed; but this does not mean that it is unconstitutional.

In commenting upon the duty of a court to uphold a statute, Judge BARTLETT wrote in *New York Cent. & H. R. R. R. Co.* v. *Williams* (199 N. Y. 108, at p. 127): " Again and again the courts of this country have asserted the proposition, in almost every form in which the English language can phrase it, that it is their duty to uphold a statute enacted by the Legislature as constitutional if it is possible to do so without disregarding the plain command or necessary implication of the fundamental law. If the lawmakers have not violated the Constitution their work must stand until they themselves destroy it, no matter what the courts may think of its wisdom or probable effect. ' The courts have no right to set aside, to arrest or nullify a law passed in relation to a ·subject within the legislative authority on the ground that it conflicts with their notions of natural right, absolute justice or sound morality.' ·(*Slack* v. *Jacob*, 8 W. Va. 612.) "

A statute is presumed to be constitutional. Judge SELDEN wrote in *Matter of Cooper* (22 N. Y. 67, at pp. 87, 88): " But a construction which would bring an act of the legislature into direct and palpable collision with the Constitution is not to be adopted without imperious necessity. It is never to be presumed that the Legislature has violated the organic law. A strong presumption to the contrary is indeed to be overcome in every case before a law can with propriety be declared unconstitutional. If by the application of the established rules of statutory construction it can be so interpreted as to harmonize with the Constitution, this interpretation is to be adopted. One of these rules is that a statute is to be considered as passed in view of, and is to be construed in connection with, the existing laws on the same subject. Another is, that we are to look at the general scope and design of the law, at the evil to be remedied, or the benefit attained; and so to construe the laws as to accomplish the object the legislature has in view."

" Their validity must be determined solely with reference to constitutional restrictions, and not by natural equity or justice. (*Bertholf* v. *O'Reilly*, 74 N. Y. 509.)" (*People* v. *Buffalo Fish Co.*, 164 id. 93, 97.) A case must be practically free from doubt before an act of the Legislature should be declared unconstitutional. An act may not be declared void because a court may deem it opposed to natural justice and equity. Every presumption is in favor of the constitutionality of legislative acts. (*People* v. *Gillson*, 109 N. Y. 389, 398.)

" The States are left with a wide range of legislative discretion, notwithstanding the provisions of the Fourteenth Amendment; and their conclusions respecting the wisdom of their legislative acts are not reviewable by the courts." (*Arizona Employers' Liability Cases*, 250 U. S. 400, 419; 39 S. Ct. 553, 555; 63 L. Ed. 1058; *Matter of Evans* v. *Berry*, 262 N. Y. 61, 69.)

Judge PECKHAM wrote in *People ex rel. Carter* v. *Rice* (135 N. Y. 473, at pp. 483, 484): " The rule which has governed courts ever since the adoption of our Constitutions, both Federal and State, in relation to the exercise of the power to declare an enactment of the legislative body unconstitutional, has been laid down in many reported cases and has been rigidly adhered to by both the Federal and State courts. Before courts will deem it their duty to declare an act of the Legislature void as in violation of some provision of the Constitution, a case must be presented in which there can be no rational doubt. The incompatibility of the legislative enactment with the Constitution must be manifest and unequivocal."

Coming now to the contentions of the plaintiffs, it needs no argument to convince one that the property of one person cannot

be taken and given to another without compensation and that all employers cannot be treated as a single employer and their assets pooled, regardless of their individual obligations, unless the public welfare shall be promoted thereby. In *Railroad Retirement Board* v. *Alton R. Co.* (295 U. S. 330, at p. 357; 55 S. Ct. 758, 765; 79 L. Ed. 1468) Mr. Justice ROBERTS wrote: "There is no warrant for taking the property or money of one and transferring it to another without compensation, whether the object of the transfer be to build up the equipment of the transferee or to pension its employees." And again (295 U. S. 330, at p. 360; 55 S. Ct. 758, 767; 79 L. Ed. 1468): "We conclude that the provisions of the Act which disregard the private and separate ownership of the several respondents, treat them all as a single employer, and pool all their assets regardless of their individual obligations and the varying conditions found in their respective enterprises, cannot be justified as consistent with due process." Employers cannot be denied the equal protection of the laws (*Wright* v. *Hart*, 182 N. Y. 330, 334; *Louisville Gas & Electric Co.* v. *Coleman*, 277 U. S. 32, 37; 48 S. Ct. 423; 72 L. Ed. 770); or liberty of contract (*People* v. *Marcus*, 185 N. Y. 257, 259), nor can property be taken for purely private purposes (*People* v. *Westchester County National Bank of Peekskill, N. Y.*, 231 N. Y. 465, 470); nor can arbitrary, discriminatory or unreasonable classifications for taxing purposes be imposed (*People ex rel. Farrington* v. *Mensching*, 187 N. Y. 8, 16, 17).

In determining whether the act is repugnant to the Constitution, it is important to note the legislative policy declared therein. Section 500 provides: "As a guide to the interpretation and application of this article, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, welfare and morals of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. After searching examination of the effects of widespread unemployment within the State, the joint legislative committee on unemployment appointed pursuant to a joint resolution adopted April ninth, nineteen hundred thirty-one, has reported to the Legislature that ' the problem of unemployment can better be met by the so-called compulsory unemployment insurance plan than it is now handled by the barren actualities of poor relief assistance backed by compulsory contribution through taxation. Once the facts are apprehended this conclusion is precipitated with the certainty of a chemical reaction.' Taking into account the report of its own

committee, together with facts tending to support it which are matters of common knowledge, the Legislature therefore declares that in its considered judgment the public good and the well-being of the wage earners of this State require the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own." And to compare the act, expressive of the legislative policy, with the Constitution. Section 19 of article 1 of the Constitution of the State of New York (adopted November, 1913) provides, in part: " Nothing contained in this Constitution shall be construed to limit the power of the Legislature to enact laws for the protection of the lives, health, or safety of employees; or for the payment, either by employers, or by employers and employees or otherwise, either directly or through a State or other system of insurance or otherwise, of compensation for injuries to employees or for death of employees resulting from such injuries without regard to fault as a cause thereof."

The foregoing amendment resulted from the decision in the case of *Ives* v. *South Buffalo R. Co.* (201 N. Y. 271), which held the Workmen's Compensation Act of 1910 unconstitutional. Before making the comparison, it is well to understand what the people had in mind when they adopted said amendment. The Workmen's Compensation Act had been declared unconstitutional by the Court of Appeals on substantially all of the grounds urged in the instant case. In his very able opinion, Judge WERNER wrote (201 N. Y. 271, at p. 301): " In order to sustain legislation under the police power the courts must be able to see that its operation tends in some degree to prevent some offense or evil, or to preserve public health, morals, safety and welfare." And again (201 N. Y. 271, at p. 302): " But the new addition to the Labor Law is of quite a different character. It does nothing to conserve the health, safety or morals of the employees, and it imposes upon the employer no new or affirmative duties or responsibilities in the conduct of his business." And again (201 N. Y. 271, at p. 305): " But when an industry or calling is *per se* lawful and open to all, and, therefore, beyond the prohibitive power of the Legislature, the right of governmental control must be confined to such reasonable enactments as are directly designed to conserve health, safety, comfort, morals, peace and order. (*Lochner* v. *New York*, 198 U. S. 45.) " And again (201 N. Y. 271, at p. 315): " We have tried to make it clear that in our judgment this statute is not a law of regulation. It contains not a single provision which can be said to make for the safety, health or morals of the employees therein specified, nor to impose upon the enumerated employers any duty or

obligation designed to have that effect." And again (201 N. Y. 271, at pp. 316 and 317, referring to *Musco* v. *United Surety Co.,* 196 N. Y. 459, concerning indemnity bonds for deposit for transmission to foreign countries): " It need hardly be argued that a law passed under the guise of such a purpose, but having in fact no relation to it, and accomplishing nothing to make the business of receiving deposits more safe, would be as far beyond the sphere of the police power as an amendment to the Banking Law requiring banks and bankers to protect their customers, to whom they pay moneys, against thefts or other physical losses thereof; *or an amendment to the Labor Law which would compel the industrial employers to give each employee a vacation on full pay during two months of every year."* (Italics ours.)

What did the voters have in mind when they adopted this amendment? They were thoroughly familiar with Judge WERNER's decision because it had been the subject of widespread discussion preceding the election of 1913. In interpreting this amendment, consideration must be given to what the people had in mind when they went to the polls. (*Matter of New York District R. Co.,* 42 Hun, 621, 625.) We must also consider the cause or necessity for its adoption. (*People ex rel. Killeen* v. *Angle,* 47 Hun, 183, 187, citing *People ex rel. Wood* v. *Lacombe,* 99 N. Y. 43.)

The first clause of the amendment provides that " nothing contained in this Constitution shall be construed to limit the power of the Legislature to enact laws for the protection of the lives, health, or safety of employees," and then follows a wholly disjunctive provision relating to workmen's compensation. At the time this amendment was adopted, the State already had statutes providing for the protection of the lives, health and safety of employees and others, the constitutionality of which was not in doubt. Did not the people, when they adopted this amendment, intend to and have the right to believe that they were empowering the Legislature to go still further and to enact any law, not arbitrary or unreasonable, for the protection of the lives, health, general welfare and safety of employees during and outside of working hours? Did they not intend to empower, believe they were empowering, and empower, the Legislature to legislate in this field to the fullest degree? I think they did.

The protection of the life, the health, the safety of an individual is not limited to the hours actually spent in the establishment or in the business of his employer. These terms have a much broader meaning since the amendment adopted as a result of the holding in the *Ives* case. The people intended the amendment to be broad enough to meet the criticism of the court in the *Ives* case. Certainly

an empty purse and an empty larder have a very intimate relation to the lives, health and safety of employees. (*Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523; 55 S. Ct. 497; 79 L. Ed. 1032, 1038.) Moreover, this amendment was adopted at a time when the rights of the working man were on the threshold of a larger realization. In 1915, Mr. Justice CARDOZO, in *People* v. *Crane* (214 N. Y. 154, at pp. 164, 165), wrote: " Everywhere throughout the world the State, in its relation to the laborer, is assuming a larger obligation; but it cannot be that it owes this obligation to citizens and aliens in equal measure. In Great Britain there was enacted in 1908 a statute providing for old age pensions, restricted, it may be noted, to British subjects. (8 Edw. 7, chap. 40, sec. 1.) In the same kingdom there was enacted in 1911 a statute providing for insurance against unemployment. (1 & 2 George 5, chap. 55.) In our own country the workmen's compensation laws that have been adopted in many states are phases of the same world-wide movement. We are not concerned at this time with the validity of these measures for the alleviation of the laborer's lot. We mention them as illustrations of an expanding consciousness in the modern state that relief against unemployment, both after the event and before it, is part of the state's function."

Certain it is that the people, when they voted for the amendment, did not intend to put the Legislature in a straight jacket. They supposed they were authorizing the Legislature to pass laws to safeguard the health and welfare of employees both during and outside of working hours.

Measures taken to mitigate the economic and social affairs of unemployment are public welfare purposes, hence proper for legislative action within the requirements of due process. " It needs no citation of authorities to sustain the postulate, that except as restrained by the Constitution, the legislative power is untrammeled and supreme, * * *. Nothing is subtracted from the sum of legislative power, except that which is expressly or by necessary implication withdrawn." (*Matter of Thirty-fourth Street R. R. Co.*, 102 N. Y. 343, 350, 351.) Even the power of the United States to levy taxes to provide for the general welfare does not permit it to invade any field of activity not expressly placed within its jurisdiction by the States. (*United States* v. *Butler*, 297 U. S. 1; 56 S. Ct. 312; 80 L. Ed. ——.) The State alone has the power to control manufacture and distribution within its boundaries. Where legislation is needed, it alone is competent to provide it. (*Hammer* v. *Dagenhart*, 247 U. S. 251, 272, 274; 38 S. Ct. 529; 62 L. Ed. 1101.) The limitation imposed on the Legislature by the Constitution in the exercise of this great power is this: The legislation must promote the public

welfare by means having a real and substantial relation to that end and shall not be unreasonable, arbitrary or capricious, but "under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest" and "so far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*." (*Nebbia* v. *New York*, 291 U. S. 502, 523, 525, 537; 54 S. Ct. 505, 510; 78 L. Ed. 940.) If the States are to have power to meet great public needs as they arise, no more definitive boundaries are advisable. Each case must be decided as the problem arises and the validity of the legislative solution is questioned. (*Noble State Bank* v. *Haskell*, 219 U. S. 104, 112; 31 S. Ct. 186; 55 L. Ed. 112.)

It is a legislative function to determine the necessity of the public welfare. The Legislature has stated, in section 500, that economic insecurity due to unemployment is a serious menace to the welfare of the people of the State requiring appropriate legislative action. Facts underlying a State regulation will condition its validity. Determination of those facts is primarily a legislative function. They establish the necessity for legislative action. The Legislature's findings and the validity of its action are endowed with a presumption in their favor which must be overcome by one who questions them. (*O'Gorman & Young* v. *Hartford Fire Ins. Co.*, 282 U. S. 251, 257, 258; 51 S. Ct. 130; 75 L. Ed. 324.) Courts will reach a conclusion contrary to that of the Legislature with regard to the existence of facts upon which the constitutional validity of a statute depends, only with great caution. (*Radice* v. *People of State of New York*, 264 U. S. 292, 294; 44 S. Ct. 325; 68 L. Ed. 690.) But courts must be able to see that there is a reasonable basis for such a finding and that the legisla-

tive action has a real and substantial relation to the public welfare. (*Jacobson* v. *Massachusetts*, 197 U. S. 11, 31, 39; 25 S. Ct. 358; 49 L. Ed. 643.)

The relief of poverty and want unquestionably is a proper subject of public concern. Unemployment, especially in case of one who is willing to work, creates destitution. The present depression is proof enough of this fact. It will continue to do so unless some method is provided to insure against it. As unemployment increases, purchasing power diminishes. No purchasing power, no markets for the products of industry; result, corresponding fall in prices and wages, thus affecting the prosperity and well-being of the people of the State.

Loss of life and limb in industrial occupations is a matter of public concern. The burden of relieving the loss to employees caused by industrial accidents was properly placed upon the industries that occasioned it as a cost of operation. (*Mountain Timber Co.* v. *State of Washington*, 243 U. S. 219; 37 S. Ct. 260; 61 L. Ed. 685.) In *New York Cent. R. R. Co.* v. *White* (243 U. S. 188, 207; 37 S. Ct. 247; 61 L. Ed. 667) the Supreme Court of the United States held that the State's concern for the continued life and earning power of the individual to prevent pauperism, with its concomitants of vice and crime, brought a system of workmen's compensation, regardless of fault, within the police power of the States.

The Unemployment Insurance Act has not attempted and does not attempt to replace the present relief system. Its benefits do not become payable until 1938, and then only to those who have been employed within the two years preceding the date when benefits commence. The act recognizes that the economic security and well-being of the people of the State require some intervention to mitigate for the future the demonstrated evils of cumulative unemployment. The plan requires the set-up of reserves accumulated from payments by employers based on three per cent of their applicable payrolls. Out of this fund limited benefits will be paid to employees subsequently losing their employment. The reasonableness of this statutory adaptation to the end sought is plain. It places the burden primarily on the industry as a whole. It is industry which creates employment and unemployment. It is industry which relies upon a supply of labor and profits by the use of it. The evils caused by unemployment are not the fault of either employer or employee nor are they traceable to one industry or to several. They inhere in industry as a whole, and it is reasonable and proper that the cost of mitigating them should be borne by it in the first instance. The cost is

eventually borne by the general public which requires the products of industry and in the last analysis pays the whole cost of producing them. The beneficiaries themselves are part of that public. (*Arizona Employers' Liability Cases*, 250 U. S. 400, 433; 39 S. Ct. 553; 63 L. Ed. 1058.)

A levy of three per cent on payrolls representing the beneficiary class is not so high as to be arbitrary or confiscatory. It happens to be very small in the ultimate cost figures.

The payment of benefits for a limited period to those who become unemployed will relieve their wants for a reasonable period during which re-employment may be sought. It will prevent them from becoming a burden on the State and will tend to maintain the purchasing power of the public which will stabilize industry. These obvious results all follow reasonably from the operation of the law and tend to accomplish its ultimate object.

A consideration of the history of unemployment insurance emphasizes two things: *First,* that the need for a form of insurance against the social and economic hazards of employment has been extensively recognized; and, *second,* that voluntary efforts of labor organizations, of individual employers, or individual industries are inadequate to cope with the problem and that government assistance is necessary to impose and distribute the burden and to administer the benefits.

The power of the State to raise money by taxation is complete in itself. The Legislature has the widest discretion in selecting classes of persons, property or pursuits upon which a tax may be imposed. (*People ex rel. Hatch* v. *Reardon,* 184 N. Y. 431, 443.) The use of this power to accomplish a purpose beyond the mere raising of revenue for the support of the government has long been sustained on the theory that it distributes the burden fairly with regard to the causes that give rise to the need for regulation or other control. An illustration is found in the *Head Money Cases* (112 U. S. 580; 5 S. Ct. 247; 28 L. Ed. 798.) Under the statute involved in that decision, Congress imposed a tax of fifty cents on each non-citizen brought into the United States to be paid by the owner of the ship transporting him. It was provided that the money should all go into a special single fund to be used for the care and relief of immigrants who might subsequently become indigent and, therefore, a public burden. The courts sustained the act as necessary for the protection of people among whom the aliens were deposited by the steamship companies. The court said (112 U. S. 580, at pp. 590, 591; 5 S. Ct. 247, 250): " That the purpose of these statutes is humane, is highly beneficial

to the poor and helpless immigrant, and is essential to the protection of the people in whose midst they are deposited by the steamships, is beyond dispute." The court also found that the placing of this burden on shipowners was justifiable and reasonable. Another illustration is *Mountain Timber Co.* v. *State of Washington (supra)*. The act in question in that case set up forty-seven classes of industries and provided for a payroll tax on each. Another is *State* v. *Cassidy* (22 Minn. 312; 21 Am. Rep. 765), where the court upheld a tax on saloon keepers to create a fund for the erection and maintenance of an institution for inebriates. Another is *Cooley* v. *Board of Wardens of Port of Philadelphia Use of Society for Relief of D. P.* (12 How. 299; 13 L. Ed. 996) where the court upheld a Pennsylvania statute providing for a pilotage fee to the first pilot hailing a ship although his services were not used, the money to be placed in a fund for the relief of indigent pilots and their dependents. Another is *Dayton-Goose Creek R. Co.* v. *United States* (263 U. S. 456; 44 S. Ct. 169; 68 L. Ed. 388), where the court upheld a statute providing that the income of a railroad in excess of a fair return be paid in part to a fund to be used to make loans to other roads in need of them. Another illustration is the sheep, dog, domestic animal cases. Many States passed laws protecting the owners of sheep and other domestic animals by imposing a tax upon dogs in order to create a fund for the remuneration of owners for losses suffered by such animals being killed by dogs. The tax was imposed upon all dog owners regardless of whose dog did the killing. The States sustained these laws against attacks of unconstitutionality. Many of these cases are collated in *Mountain Timber Co.* v. *State of Washington (supra, 243 U. S. 219, at p. 245; 37 S. Ct. 260; 61 L. Ed. 685)*. Still another is *Noble State Bank* v. *Haskell (supra)*. In this case an Oklahoma statute was sustained which assessed every State bank one per cent of its daily deposits to create a fund out of which to secure full repayment of the deposits in any bank that failed. In this case, Justice HOLMES wrote (219 U. S. 104, at pp. 110, 111; 31 S. Ct. 186, 187; 55 L. Ed. 112): " In the first place it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use. *Clark* v. *Nash*, 198 U. S. 361; *Strickley* v. *Highland Boy Mining Co.*, 200 U. S. 527, 531; *Offield* v. *New York, New Haven & Hartford R. R. Co.*, 203 U. S. 372; *Bacon* v. *Walker*, 204 U. S. 311, 315. And in the next, it would seem that there may be other cases beside the every day one of taxation, in which the share of each party in the benefit of a scheme of mutual protec-

tion is sufficient compensation for the correlative burden that it is compelled to assume. See *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190. At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said. It may be said in a general way that the police power extends to all the great public needs. *Camfield* v. *United States,* 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." Another is the Safety Fund Act (N. Y. Laws of 1829, chap. 94). Corporations subject to its provisions were to pay into a State fund one-half of one per cent on their capital. These payments were to continue until each corporation had paid three per cent on their capital and the fund thus created was to remain a perpetual fund to be applied to the payment of the debts of any of the corporations on their insolvency as their assets should be insufficient to pay. The foregoing cases all sustain the use of the taxing power to create a fund in the nature of an insurance reserve out of which to pay benefits for a purpose which by reason of its relation to the public welfare is a legitimate legislative object. They uphold the reasonableness of imposing the burden in the first instance on that class whose activities directly produce a public detriment as in the *Head Money Cases,* or whose activities inevitably produce a situation requiring regulation in the public interest as in the sheep-dog and compensation cases. This imposition is particularly justified when the class taxed has a relation to the evil to be remedied and is in a position to adjust the burden and distribute it to the public which is the ultimate beneficiary. The pertinence of these cases to the purpose and plan of unemployment insurance is inescapable.

It is the conduct of industry as a whole which produces great fluctuation in employment, with consequent loss to the people of the State. Industry is in a position to adjust prices; therefore, it is reasonable to assess the direct cost of unemployment insurance against it as a part of the cost of engaging in industry. As Justice HOLMES wrote, in *Arizona Employers' Liability Cases* (*supra,* 250 U. S. 400, at p. 433; 39 S. Ct. 553, 560; 63 L. Ed. 1058): " It is said that the pain cannot be shifted to another. Neither can the loss of a leg. But one can be paid for as well as the other. It is said that these elements do not constitute an economic loss, in the sense of diminished power to produce. They may. *Ball* v. *William Hunt & Sons, Ltd.,* [1912] A. C. 496. But whether they do or not they are as much part of the workman's loss as the loss of a limb. The Legislature may have reasoned thus.

If a business is unsuccessful it means that the public does not care enough for it to make it pay. If it is successful the public pays its expenses and something more. It is reasonable that the public should pay the whole cost of producing what it wants and a part of that cost is the pain and mutilation incident to production. By throwing that loss upon the employer in the first instance we throw it upon the public in the long run and that is just. If a Legislature should reason in this way and act accordingly it seems to me that it is within constitutional bounds. *Erickson* v. *Preuss*, 223 N. Y. 365."

The illustrative cases sustain the principle of setting up pooled funds without reference to the extent to which particular individuals have created the need for the legislation. The pooled fund is held to be the most effective method of distributing the burden among the class properly taxed, especially where it is difficult or impossible to determine the result with relation to particular individuals. In the sheep-dog cases, damages were paid out of a pooled fund without reference to whose dog was responsible. In the *Head Money Cases* the relief of aliens was paid out of a general fund regardless of whose ship had transported them.

The criticism that the act draws no distinction between employers who have no unemployed and those who have, employers who are insolvent and those who are not, employers who have no strikes and those who have, etc., is disposed of in the *Mountain Timber Case (supra)*. The court said (243 U. S. 219, at p. 244; 37 S. Ct. 260, 267; 61 L. Ed. 685): " To the criticism that carefully managed plants are in effect required to contribute to make good the losses arising through the negligence of their competitors, it is sufficient to say that the act recognizes that no management, however careful, can afford immunity from personal injuries to employees in the hazardous occupations, and prescribes that negligence is not to be determinative of the question of the responsibility of the employer or the industry. Taking the fact that accidental injuries are inevitable, in connection with the impossibility of foreseeing when, or in what particular plant or industry they will occur, we deem that the State acted within its power in declaring that no employer should conduct such an industry without making stated and fairly apportioned contributions adequate to maintain a public fund for indemnifying injured employees and the dependents of those killed, irrespective of the particular plant in which the accident might happen to occur. In short, it cannot be deemed arbitrary or unreasonable for the State, instead of imposing upon the particular employer entire responsibility for losses occurring in his own plant or work, to impose the burden

upon the industry through a system of occupation taxes limited to the actual losses occurring in the respective classes of occupation."

The *Noble State Bank* case turned entirely on the question of whether banks might be compelled to contribute to a general fund out of which deposits were repaid without any limitation to the amount paid in by the bank which had failed.

The argument for the pooled method is persuasive indeed in the case of unemployment insurance, since it is impossible to measure the effect of any one cause inducing unemployment. The complexity and interdependence of all causes demonstrate that it is industry as a whole which is responsible for unemployment.

Counsel for plaintiffs and the brief of *amicus curiæ* argue with great force that the New York act is unconstitutional under the decision of the United States Supreme Court in the *Railroad Retirement Board Case (supra)*. The court disagrees with them. The main ground upon which the Retirement Act was invalidated was that it was not within the competence of Congress to pass it because it was not a regulation of interstate commerce. Its proponents attempted to relate it to a public welfare purpose as an interstate commerce regulation by claiming that it promoted safety, efficiency and economy. This contention was rejected by the court. The court then found several features which were held to conflict with due process. The act was not related to any proper public purpose and was held to deprive the railroads of their property without due process. The several features of the Retirement Act (U. S. Code, tit. 45, § 201 *et seq.*) which the court found objectionable may be distinguished. Old age, in a particular class of industry, does not create a problem. Compulsory contributions by the railroad to a retirement fund, therefore, constituted a gratuity, particularly as to those who had left their service. On the other hand, unemployment insurance benefits only become payable to those who have been in industry and on whose wages a contribution has been paid. The whole plan of age retirement requires payments for services wholly compensated for, while unemployment insurance insures against a public evil. Finally, the act pooled the contributions of all members of the industry, when the facts indicated that the proportionate share of each for its own employees could feasibly have been determined.

The Unemployment Insurance Act is but the application of a well-tried and uniformly sustained type of police regulation directed to the problem of inevitable unemployment which has reached a stature making such legislative intervention both reasonable and necessary. It cannot be said that the New York Unemployment Insurance Act has no relation to the public welfare or that it does

not reasonably tend to promote it by means neither arbitrary nor capricious. As was said in *Noble State Bank Case* (*supra*, 219 U. S. 104, at p. 111; 31 S. Ct. 186, 187; 55 L. Ed. 112), "in a general way that the police power extends to all the great public needs."

There is no evidence of erroneous classification or that the industries could be classified at this time. To classify them after experience in operation and further study seems a sensible provision. In this situation, the evident purpose of the original act to classify the various industries is sufficient answer to any contention of improper distribution of the burden amongst the industries themselves. (*Mountain Timber Co. Case, supra,* 243 U. S. 219, at p. 242; 37 S. Ct. 260; 61 L. Ed. 685.)

The provision prohibiting employers from deducting any part of the contributions from the wages of their employees or making agreement with employees to that end does not amount to a denial of due process or constitute an infringement of one's freedom to contract. (*Mountain Timber Co.* v. *State of Washington, supra,* 243 U. S. 219, at p. 246; 37 S. Ct. 260; 61 L. Ed. 685.)

Making the act applicable to employers of four or more persons does not convict the Legislature of arbitrary classification. (*Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571, 575; 35 S. Ct. 167; 59 L. Ed. 364.)

The fact that benefits are obtainable by persons who are in no immediate need does not invalidate the act. In the *Mountain Timber Co. Case* (*supra,* 243 U. S. 219, at p. 240; 37 S. Ct. 260, 266; 61 L. Ed. 685) the court said: "It is said that the compensation or pension under this law is not confined to those who are left without means of support. This is true. But is the State powerless to succor the wounded except they be reduced to the last extremity? Is it debarred from compensating an injured man until his own resources are first exhausted? This would be to discriminate against the thrifty and in favor of the improvident. The power and discretion of the State are not thus circumscribed by the Fourteenth Amendment." The provision imposing a penalty upon employers who *willfully* refuse or *neglect* to pay their contributions is not unconstitutional. (*Matter of Jensen* v. *Southern Pac. Co.,* 215 N. Y. 514, 525; revd., 244 U. S. 205; 37 S. Ct. 524; 61 L. Ed. 1086, on another point.)

Section 300· of the Tax Law provides: "Neglect or refusal to pay any tax shall not be punishable as a contempt or as misconduct; and no fine shall be imposed for such nonpayment, nor shall any person be imprisoned or otherwise punishable on account of nonpayment of any tax, or of any fine imposed for refusal or neglect

to pay such tax." Subdivision 2 of section 528 of the Unemployment Insurance Act provides that any person who *willfully* refuses to pay a contribution to the fund shall be guilty of a misdemeanor. It is to be noted that no penalty is imposed for a neglect or failure to pay the contribution required by the Unemployment Insurance Act. It is only imposed in the event of a *willful* refusal or failure to pay. The element of *willfulness* is lacking in section 300 of the Tax Law. The provisions are not in conflict.

In the *Jensen Case* (*supra*, 215 N. Y. 514, at p. 528) Judge MILLER said: " Surely it is competent for the State in the promotion of the general welfare to require both employer and employee to yield something toward the establishment of a principle and plan of compensation for their mutual protection and advantage. Any plan devised by the wit of man may in exceptional cases work unjustly, but the act is to be judged by its general plan and scope and the general good to be promoted by it. Fortunately the courts have not attempted to define the limits of the police power. Its elasticity makes progress possible under a written constitution guaranteeing individual rights."

" Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream, as this court has said more than once." (*Head Money Cases*, *supra*, 112 U. S. 580, at p. 595; 5 S. Ct. 247, 252; 28 L. Ed. 798.)

The provisions of section 504 of the act requiring employers to contribute to the fund for benefits to employees who have been lawfully discharged either for incompetency, sabotage or theft, or those who have voluntarily left their employment, or who have withdrawn from it by reason of strike, lockout or other industrial controversy, are arbitrary, unreasonable, unjustifiable, discriminatory, and constitute the taking of property without due process. (*Railroad Retirement Board* v. *Alton R. Co.*, *supra*, 295 U. S. 330, at p. 366; 55 S. Ct. 758; 79 L. Ed. 1468.) Especially is this true when no valid reason underlies the movement. No doubt there are occasions when conditions become intolerable and men are forced to strike in order to protect their rights. The Legislature should remedy that situation by appropriate legislation.

The cases of *People* v. *Westchester County National Bank of Peekskill, N. Y.* (231 N. Y. 465); *Citizens' Savings & Loan Assn.* v *Topeka* (20 Wall. 655; 22 L. Ed. 455); *Weismer* v. *Village of Douglas* (64 N. Y. 91); *Lowell* v. *City of Boston* (111 Mass. 454; 15 Am. Rep. 39); *Bush* v. *Board of Supervisors of Orange County* (159 N. Y. 212); *Lucas County Auditor* v. *State ex rel. Boyles* (75 Ohio St. 114; 78 N. E. 955); *Wisconsin Keeley Institute Co.* v. *Milwaukee County* (95 Wis. 153; 70 N. W. 68); *State ex rel. Garrett* v. *Froehlich*

(118 Wis. 129; 94 N. W. 50); *State ex rel. Garth* v. *Switzler* (143 Mo. 287; 45 S. W. 245); *Deal* v. *Mississippi County* (107 Mo. 464; 18 S. W. 24); *Oxnard Beet Sugar Co.* v. *State of Nebraska* (73 Neb. 57; 102 N. W. 80; 105 id. 716); *Michigan Sugar Co.* v. *Auditor General Dix* (124 Mich. 674; 83 N. W. 625); *Minnesota Sugar Co.* v. *Iverson* (91 Minn. 30; 97 N. W. 454) are distinguishable in that neither the public welfare nor any great public exigency were so directly involved as to warrant the exercise of either the police or the taxing power and the property of one person was given to another without compensation and for a purely local or private purpose.

It is argued that employers will be deprived of their property without just compensation. In a sense employers and employees are engaged in a joint venture. One could not operate without the assistance of the other. It will be of great value to industry in times of unemployment to have their unemployed workers on benefit rather than objects of charity. The workers will feel they have helped to produce what they are receiving, thus preserving their morale. Moreover, they will be ready to resume work when needed. Surely it should be more advantageous to industry to have their old and experienced employees when needed than to have to organize a nondescript force. Furthermore, industry would have to contribute for the support of their unemployed if they were on the dole. While the cost settles upon employers in the first instance, they will be able to pass it along to the consuming public. Unemployed employees will indirectly contribute to the amount of contributions made by employers. On February 17, 1936, Dr. Pritchett, in his Carnegie Foundation Report, states: " The great bulk of all actual expenditures are made by people of small or moderate means. Two-thirds of the spending comes from labor."

The State intervenes to make its inhabitants healthy, not sick. Economic welfare is always related to health for there can be no health if men are starving. (*Baldwin* v. *G. A. F. Seelig, Inc., supra,* 294 U. S. 511, at p. 523; 55 S. Ct. 497, 500; 79 L. Ed. 1032.)

Whether this legislation be regarded as a mere exercise of the power of regulation or as a combination of regulation and taxation, it is a fair and reasonable exertion of governmental power and it is not so extravagant or arbitrary as to constitute an abuse of power. The police power is as broad and plenary as the taxing power. The Fourteenth Amendment was not designed to interfere with the power of the State, sometimes termed the police power, to prescribe regulations to promote the health, peace, morals, edu-

cation and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity. . Laws of this character do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. The act cannot be catalogued as class legislation. (*Mountain Timber Co.* v. *State of Washington, supra.*)

It is neither arbitrary nor unreasonable to compel industry to compensate their injured employees. The public interest is not confined to the mere regulation of business. It may condition, under the police power, the relations between employees and industry in the interest of the public welfare. To compel industry to make reasonable contribution to a fund out of which benefits are payable to its unemployed workers does not deprive it of its property without due process or of the equal protection of the laws and to forbid it to charge any portion of the contribution to employees or to agree with them to assume any responsibility therefor does not invade its right in respect to freedom of contract. Such an act is not oppressive. (*New York Central R. R. Co.* v. *White, supra.*)

In comparing the act with the Constitution, the similarity is likely to be obscured unless we have taken the precaution to wipe the mist from our spectacles. We are too definitely committed to a program of security for those who toil to even think of retracing our steps. Industry rebelled against workmen's compensation, yet it proved a blessing to it and to the toilers as well. Industry, with its resourcefulness, will find a way to operate efficiently and profitably under unemployment insurance and ultimately will accept it as a blessing. After all, the benefit the worker will receive under the act is in a sense his share of the profits he helped to create. The workingman is entitled to a job. If industry, charged with the responsibility of supplying work, cannot provide him one, then it should be compelled to contribute to a fund from which he and his family may have bread while he is seeking employment. The burden of his support, while unemployed, should not be imposed on the taxpaying public, thus absolving those who, by engaging in an industrial enterprise, have undertaken voluntarily to furnish such employment as may be needed in their business.

The act is criticized because employees are not required to contribute to the benefit fund. Considering the fact that the resources of laboring people have been seriously depleted and in most cases entirely exhausted due to prolonged unemployment, I think the Legislature acted wisely and humanely in exempting them, for the present, from contributing directly to this fund.

When they have repaired their shattered fortunes, most of them will be willing to and should contribute a part of their earnings to this fund. Considering the history of unemployment insurance in England, the Legislature very wisely exempted the State from contributing to the fund. No drafts can be drawn against the revenues of the State to promote the fund. It must depend on its own resources and such aid as it may receive from the Federal government. The fund pays benefits only when it has the means to do so.

It is undoubtedly true that industries in States which have unemployment insurance acts will suffer in competition with similar industries in States which have none. This is not an argument against the validity of the act. It is one for the Legislature to consider.

The court finds that the object of the legislation in question is of general public moment and does not interfere with personal liberty or the right of acquiring property; that the charges placed upon the employers are not so burdensome as to be manifestly oppressive; that the burden is fairly distributed having regard to the causes that give rise to the need for the legislation; that the act, except as above held, promotes the general welfare, is a valid exercise of the police power, is not repugnant to the Constitution of the State of New York or to the Fourteenth Amendment of the Federal Constitution; that plaintiffs have failed by argument or evidence to prove to the contrary; that said unconstitutional provision can be severed, as required by the act, without destroying the act itself.

Plaintiffs' motions, so far as the provisions of the act declared unconstitutional are concerned, are granted, but otherwise denied. Defendants are entitled to judgments (Rules Civ. Prac. rule 112) dismissing plaintiffs' complaints and declaring said act to be constitutional except as above indicated.

I should not close this memorandum without expressing my appreciation for the very helpful briefs submitted by counsel for the litigants and by the friends of the court and congratulating them on the high character of the oral arguments delivered in defense of their views.

Enter orders accordingly, without costs.